**Charles Edwin REID, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defend-
ant in Error.**

**No. A–15391.**

Court of Criminal Appeals of Oklahoma.

Oct. 21, 1970.

Rehearing Denied Jan. 21, 1971.

Leonard · G. Geb and Jack N. Shears, Ponca City, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Max A. Martin, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Charles Edwin Reid, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Kay County for the crime of Murder; his punishment was assessed at death in the electric chair, and he appeals.

The record reflects that Ervin Clifford Sinclair, the deceased, was operating a Gulf Service Station located just off Interstate 35 near Braman, Oklahoma, on the morning of September 9, 1968. He was observed to be present in the station on that morning at 2:00 a. m. Witness Allen Lane entered the service station at approximately 2:45 on the morning of September 9, 1968 with David Morris, and found the body of the deceased and Morris summoned police to the station. All of the witnesses who viewed the deceased's body at the crime scene testified that his face was covered with blood and that they could not observe any specific wounds. The medical examiner testified that the deceased's body had six bullet holes in the head and that the wounds could have been made by a .22 caliber weapon. It was his opinion the victim died from multiple gunshot wounds of the head.

The evidence further disclosed that the sum of $130–$135 had been taken from the cash register between 2:00 a. m. and 2:45 a. m. on September 9, 1968. It was established that shell casings found at the scene were fired in the rifle identified as State's Exhibit 18, and that portions of a bullet found in the head of the victim were also fired from this rifle.

The defendant was arrested on September 10th at approximately 5:00 p. m. on the

basis of information provided by Darlene Hill. At the time of his arrest he was wearing shoes stained with blood which matched the blood type of the deceased. The State's evidence further established that on September 8th the defendant had in his possession a .22 caliber nylon rifle (State's exhibit 18), which he had borrowed from Tommy McGuire, and that during the day defendant, McGuire and others had target practiced; that defendant drove McGuire home after the target practice and left with the rifle in his pickup truck.

McGuire's father testified that he returned to his home on the morning of September 9, 1968 around 2:00 a. m. and that the rifle was not on the porch and that his son, Tommy, was asleep in the front room on the couch; that after he had retired he was alerted by a barking dog some time after 3:00 a. m. and that he observed a pickup truck leaving from the front of his house. Susan McGuire testified that she found the rifle (State's exhibit 18) on the front porch of the McGuire home around 8:15 on the morning of September 9, 1968.

The evidence further disclosed that approximately five hours before the homicide occurred, the defendant was broke and borrowed $5.00 from a tavern owner, but that 45 minutes after the time of the homicide defendant went to the home of Darlene Hill and gave her $30.00 and that she observed a large amount of money left in his billfold. The defendant then asked to spend the remainder of the night in her home but she refused and he later drove to the apartment of Doris Fay Nichols and Gail Ann Moorman, and that they refused to allow him to spend the night.

The evidence further disclosed that at approximately 10:00 a. m. on the morning of the homicide, defendant paid $20.00 to Robert D. McGee; that defendant paid Mrs. L. E. Ellison $45.00 some time between 10:00 a. m. and 11:00 a. m. on that same date; and sales tickets found in defendant's pickup indicated purchases of $12.98 on September 9, 1968.

At the time of defendant's arrest he was advised of his constitutional rights; he was then taken before Judge Maris and advised of his constitutional rights by agents of the Oklahoma Bureau of Investigation and Sheriff Coffelt, and he gave a statement after stating that he had nothing to hide and he might as well give the statement.

The statement, in pertinent substance, was that the defendant had driven to the scene of the homicide where he observed "a car zipping out of there real fast and some colored guys. Had one head light out. This had 4 head lights and one was out. Going up on the Interstate." He entered the service station and observed that the cash register drawer had been opened. He remained at the service station several minutes during which time he found the body of the deceased lying in a pool of blood; he stated that he lifted the deceased's head and observed a bullet hole between the eyes; that he got the blood on his glove which was later found on the steering wheel of his pickup truck; and he accounted for the blood on his shoes by stating that he had stepped in a pool of blood at the scene of the homicide. He further stated that he drove at a high rate of speed to the home of Darlene Hill and paid her $30.00 which he had taken from her earlier. He denied committing the homicide and stated, "I just hope you work as hard to prove I'm not guilty as you do to prove me guilty."

The defendant did not testify in his own behalf but offered testimony of Marvin Looper and Joan Looper who testified, in substance, that the Loopers had given a birthday party for Marvin's sister, Rita Looper, on September 16, 1968, at which intoxicating beverages were drunk; that during the course of the evening Tommy McGuire had stated to them that he (McGuire) and not Reid, had committed the robbery and murder of Mr. Sinclair on the early morning of September 9th; that McGuire had changed clothes with the defendant and that was how the blood got on

defendant's clothing. Anthony Vitacolonna testified that on September 8, 1968, defendant entered his bar at about 11:10 p. m. and Darrell Landers testified that on September 8th he paid defendant's mother $60.00.

Thomas Key was called in rebuttal for the State. According to the Loopers, Tommy McGuire stated that he tried to wipe up some of the blood at the scene with a sheet he found in defendant's pickup. Mr. Key testified that the only sheet that was involved in the investigation was one which was found at the adjacent motel and which had only one small spot of blood on it. Also, according to the Loopers, Tommy McGuire stated that he fired one shot through the service station window. Mr. Key testified that none of the outside windows of the station had bullet holes in them.

William Joe Thele was also called in rebuttal for the State. According to the Loopers, Tommy McGuire stated that he and defendant rode around together drinking on September 8th. William Joe Thele testified that he was with Tommy McGuire about 10:00 p. m. until 11:25 p. m. on that date and that they saw defendant at Al's Drive-in in Blackwell at about 10:00 p. m.; however, when they left Al's Drive-in, defendant was still there. He further testified that he took Tommy McGuire home at about 11:25 p. m.

Susan and Jackie Wayne McGuire both testified in rebuttal that their brother, Tommy, came home around 11:15 p. m. on September 8, 1968, and did not leave thereafter.

■ From the foregoing recital of facts it is readily apparent that the evidence on behalf of the State amply supports the verdict of the jury. We will, therefore, consider all of defendant's assignments of error urged on appeal, but not necessarily in the order in which they were presented in his brief.

It is first contended that the trial court abused his discretion in refusing to grant a continuance prior to trial. The proceedings on this application fully appear in the record at pages 3 and 4, as follows:

"MR. GEB: Comes now the defendant, Charles Edwin Reid, and moves for a continuance for the reason that he was brought to this jurisdiction only yesterday, approximately at six o'clock, and not made available for the defendant to prepare his case * * * brought here from Supply, Oklahoma; and for the further reason that after the defense attorney did talk to the defendant, that he observed defendant was in serious physical condition and under constant medication and because of ill health, unable to go to trial, to the prejudice of the defendant. And for the Court's benefit I will put the Sheriff on or if the State would stipulate that he did arrive last night around six o'clock in this county, it will save some testimony, or whatever the Court * * * But I think that's not contested. MR. HAYNES: If it please the Court, we at this time wish to state to the Court, as District Attorney of the Eighth Judicial District of Oklahoma, wherein I might state to the Court that even though he hasn't been available to the defendant's attorney, the defendant's attorney has been out to Fort Supply and has visited with him and talked to him; he talked to him as late as last night, the 4th of May, 1969. He had him at Fort Supply for observation or we did or the State of Oklahoma did. In my presence he was directed by the Court to proceed out there and to talk to him on different dates before he did go out there and talk to him, and we think at this late hour that it's frivolous, that it's immaterial, that his motion is not good, and we ask that it be overruled and the defendant in this case be saved an exception. THE COURT: This Court has been informed by the doctors in charge of the hospital, Western State Hospital at Fort Supply, that the defendant is physically and mentally able to proceed to this trial at this time, and, therefore, the motion for continuance is overruled and exception is allowed to the defendant."

In Wimple v. State, Okl.Cr., 397 P.2d 696 (1964), this Court stated:

"No testimony or affidavits from physicians as to defendant's physical condition was presented—nothing except an affidavit of defendant was presented to the trial court.

This Court has held, as in the case of Shetsky v. State, (1955) Okl.Cr., 290 P.2d 149:

'To justify a continuance the burden is on movant claiming illness of self, a witness or attorney, to make a proper showing, and whether the continuance should be granted depends on the circumstances, the determination of which rests in the sound discretion of the trial court.'"

Certainly, in the instant case the trial court had had an opportunity to observe the defendant. He had received information from the medical authorities at Fort Supply that the defendant was physically and mentally able to proceed to trial. Not one scintilla of evidence was offered on behalf of the defendant supporting his claim that he was unable to proceed to trial, save and except the statement of counsel. Under these circumstances we are of the opinion that the trial court's determination should not be disturbed on appeal.

As a part of his first proposition the defendant also contends that "defendant was required to take medication during the trial; and as a result of his condition and medication he was not alert and able to assist his attorney." This contention arises out of the proceedings conducted out of the presence of the jury to determine the admissibility of the written statement given to Sheriff Coffelt on September 11, 1968, after the defendant had been taken before a magistrate and advised of his rights following his arrest. It arose after counsel for the defense had conferred with his client in the hearing on the Motion to Suppress conducted out of the hearing of the jury. The pertinent statements of counsel and testimony relating to this issue appear in the record as follows:

*CM 608*

"MR. GEB: Your Honor, may I ask Mr. Reid one question before the Court rules? (Mr. Geb confers with the defendant) Mr. Welch, I know the Jury isn't here and I do have a legal matter to ask the Court about. I'm not acquainted with the procedure and I'm just asking the District Attorney in the presence of the Court, in the event that Mr. Reid would take the stand, it is my understanding that it would be for the purpose only to determine about the statement involved herein * * * what happened during the statement.

MR. WELCH: You mean in the absence of the Jury?

MR. GEB: Yes, in the absence of the Jury.

MR. WELCH: Well, the Jury would never know what took place in their absence. I would be presented to the Judge and not be presented to the Jury.

\*　　\*　　\*　　\*　　\*　　\*

*CM 609*

MR. WELCH: You can put Mr. Reid on now and not put him on in front of the Jury if you want to.

MR. GEB: We feel that the sedation that the defendant has had and in his condition that we will not be able to put him on at this time.

\*　　\*　　\*　　\*　　\*　　\*

MR. WELCH: * * * But we would request that if the defendant wants to present his own testimony on this matter, we'll wait until there is no sedation, if there is any sedation. There's no evidence of any sedation, but if that's why they're not putting him on, we'll wait and ask the Court to wait until he does feel like testifying.

THE COURT: Exhibit 33, as to the top page of that document, will be received into evidence and exception allowed to the defendant. Now, is that all the evi-

dence on this statement that you have at this time?

MR. WELCH: That's all the evidence we have, Your Honor. We would like for the defendant to clarify for the record what this sedation is he's talking about. There is no evidence of any sedation of the defendant in this court."

Thereafter, counsel for defendant placed Mr. Johnstone on the stand. Mr. Johnstone, Deputy Sheriff, who had been caring for the defendant, testified that he had been giving the defendant medication; that this medication consisted of a pain pill "that's supposed to be about three times as strong as an aspirin," and Maalox. This witness further testified that he had seen the defendant with his eyes closed the previous day during the trial, and assumed that he was dozing or sleeping, but when cross-examined by the District Attorney, he could not testify that he was asleep. At page 614 on cross-examination, the following appears:

"MR. WELCH: Q. Has Mr. Reid ever complained that he hasn't heard any of this trial?

A. No, he hasn't.

Q. This medicine, is that a sedative or stimulant or what, if you know?

A. All I know is what I was told * * * that it was a pain pill.

Q. Similar to an aspirin?

A. They said it was about twice or three times as strong as an aspirin.

Q. When you give him these pills, does it ever knock him out?

A. No, it does not.

Q. Have you seen him in the courtroom with his eyes open?

A. Yes, I have.

Q. Has he had his eyes open during the last five minutes?

A. Yes, he has.

Q. Has Mr. Geb gone over to him and talked with him during the last five minutes?

A. Yes, he has.

Q. Has he talked back to Mr. Geb?

A. Yes, he has.

Q. How many times has Mr. Geb conversed with him during this special proceedings before the Judge?

A. Mr. Geb's partner there has talked with him several times in this trial. He would ask me to ask him to come over, he wanted to talk to him."

At the conclusion of Johnstone's testimony, counsel for defense was again asked if he wished to have recess and then place the defendant on the stand in support of his Motion to Suppress the statement, and counsel for defense did not elect to do so. It does not appear, from the record, that the defendant was under sedation except for the bald assertion by his attorney that he was, which presumably was based upon his conversations with Mr. Johnstone; however, Mr. Johnstone's testimony was not that the defendant was under sedation, but rather that he was taking a pain killer two or three times as strong as aspirin which, of course, would not be classified as a sedative. Nor can it be said that Maalox (a compound similar to Milk of Magnesia), could be classified as a sedative.

■ Taking into consideration the report received by the trial judge from the medical officials at Fort Supply, his observation of the defendant during the trial, the numerous conferences between counsel and defendant during the course of the trial and out of the presence of the jury, and the complete failure of counsel for defense, or defendant, to offer any competent evidence that the defendant was under sedation to the extent that he could not aid in his defense, we must conclude that this assignment of error is also without merit. We are of the opinion that the facts in this case are similar to the facts in Shetsky v. State, Okl.Cr., 290 P.2d 149, wherein it was stated:

"The fact that defendant was tried while resting on a cot and attended by a physician, nurse and ambulance driver would not per se constitute error. [citation omitted]. The question for the trial

court to have determined was whether forcing the defendant to trial would operate to the substantial prejudice of the accused or endanger his life or health. [citation omitted]. The burden was on counsel for defendant to so show."

We shall next consider defendant's Ninth Proposition that "The Sixth and Fourteenth Amendments to the U.S. Constitution Require that Defendant be Tried by a Jury Impartial as to the Punishment Imposed." Counsel argues that:

"During the voir dire examination four prospective jurors were excluded because they didn't believe in the death penalty (CM 698). The resultant jury ultimately setting to try the case was a jury uncommonly willing to condemn a man to die.

In the recent case of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L. Ed.2d 776, it is stated:

'A defendant would be deprived of his life without due process of law by the execution of a death sentence imposed by a jury from which venireman were excluded simply because they voiced general objections to capital punish-. ment.' "

At page 698 of the case made, the following appears:

"(Thereupon, the Jury leaves the courtroom and the following record is made out of the hearing of the Jury:)

MR. GEB: Comes now the defendant, Charles Reid, and moves for a mistrial on the basis that four jurors were disqualified on the basis that they did not believe or they would not vote for the death penalty, quoting Witherspoon versus the State of Illinois. And I know the State is well acquainted with this theory and I don't think probably there should be a great lot of argument on it * * * just want to present it.

THE COURT: Yes. It will be overruled."

In the original case made the voir dire examination did not appear and in the light of the defendant's assertion under the Ninth Proposition and assertions made in the case made at page 698, supra, this Court directed that an evidentiary hearing be conducted in the trial court. An evidentiary hearing was conducted in the trial court on the 7th day of July, 1970, and the trial judge, at the conclusion of the evidentiary hearing, entered the following Findings of Fact and Conclusions of Law:

"The above entitled cause came on this 7th day of July, 1970, for an evidentiary hearing before Lester R. Maris, Presiding Judge of the Eighth Judicial District, sitting at Newkirk, Kay County, Oklahoma in pursuance to an Order of the Court of Criminal Appeals, requiring an evidentiary hearing to be conducted by the presiding Judge of the Eighth Judicial District to make Findings of Fact and Conclusions of Law in answer to the questions raised in the Ninth Proposition, of Plaintiff in Error's Appeal. The same being to the effect that jurors were excused for cause during the voir dire examination because they voiced general objections to the death penalty or expressed conscientious scruples against the infliction of the death penalty.

The Plaintiff in Error, Charles Edwin Reid, appeared in person and with his attorneys, Leonard G. Geb and Jack N. Shears. The State of Oklahoma appeared by the District Attorney, Ralph C. Haynes and the Assistant District Attorney, Donald C. Welch. Each side announced ready and the Court ordered the hearing to proceed.

Plaintiff in Error, called as the first witness, Mr. Ralph C. Haynes, the District Attorney, who conducted the voir dire examination of the jurors for the State of Oklahoma. He was asked by Mr. Geb what questions he propounded to the jurors in his voir dire. Mr. Haynes produced a sheet of paper and stated that prior to trial he had carefully examined the case of Witherspoon vs. Illinois, United States Supreme Court

case, and he had prepared a number of questions in harmony with that case, however, he testified he asked them only three questions which he designated as questions number one, two and four on his list. He then read the same into the record and for the benefit of the Court they were, as follows:

(1) Have you decided in your mind at this time, that you cannot or would not vote to impose the death penalty in this case, regardless of what the evidence might show?

(2) Would it be possible for you to vote to impose the death penalty if the evidence in this case shows it to be warranted?

(4) Is there any reason why you could not vote to impose the death penalty in a proper capital case?

The Plaintiff in Error then called Mr. Harry Evans, from Ponca City, who testified he was on the jury panel and called to the jury box in this case, but was removed on a peremptory challenge by the Plaintiff in Error, (Defendant in Trial Court). He stated he was asked a few questions but he does not remember what they were.

Plaintiff in Error then called Mrs. Hazel M. Wood, the Court Clerk who performed the duties of Clerk at the trial. She stated that Mr. Haynes did the questioning for the State on voir dire at the trial but she does not remember the specific questions asked. She did recall that one prospective juror, a Mrs. King, disqualified herself and asked to be excused saying 'she couldn't sit as a juror on this type of case'. She recalls that two or three other jurors likewise disqualified themselves and were excused.

The Court finds from the evidence submitted that the Plaintiff in Error wholly failed to sustain his Ninth Proposition, to the effect that jurors were excused for cause during the voir dire examination because they voiced general objections to the death penalty or expressed conscientious scruples against the inflic-

tion of the death penalty. The Court further finds that there were no jurors excused for cause during the voir dire examination because they voiced general objections to the death penalty or expressed conscientious scruples against the infliction of the death penalty.

The Court further finds as a Matter of Fact that the members of the jury were not asked on voir dire examination if they objected to the death penalty, or if they had conscientious scruples against the infliction of the death penalty.

The Court further finds that the questions asked by the District Attorney were proper questions on voir dire examination.

## CONCLUSIONS OF LAW

The Court, as a conclusion of law, finds that the Ninth Proposition of the Appeal by Plaintiff in Error is without merit; that no jurors were excused for cause during the voir dire examination because they voiced general objections to the death penalty or expressed conscientious scruples against the infliction of the death penalty.

The Court further concludes as a Matter of Law that the members of the jury were not asked on voir dire examination if they objected to the death penalty, or if they had conscientious scruples against the infliction of the death penalty.

It is the further conclusion of the Court that the Ninth Proposition of Plaintiff in Error should be disregarded by the Court of Criminal Appeals in considering the Appeal of the Plaintiff in Error.

Dated this 7th day of July, 1970.

/s/ Lester R. Maris
District Judge
Eighth Judicial District of the
State of Oklahoma."

◼ We deem it unnecessary to set forth the testimony of the witnesses offered in the transcript attached to the Findings of Fact and Conclusions of Law, but hold that the Findings of Fact and

Conclusions of Law as set forth, supra, are correctly based upon the evidence offered and are supported by the record.

Defendant next contends that the trial court erred in refusing to sequester the jury prior to the submission of the case to them. He refers to two instances as follows, quoting from his brief:

"Defendant requested that the jury be kept together and not allowed to separate (CM 98). The court, in response to defendant's request, stated 'I'd hope that you wouldn't make that (request) * * * And I'd be forced to tell them that the defendant has made the request and it could be to your prejudice.' (CM 98).

The court asked the defendant in the presence of the jury if he wanted the jury kept together during the afternoon coffee break. This had the effect of creating unnecessary prejudice against the defendant if he requested that they be kept together or a waiver of his right to have them kept together if he permitted their separation (CM 230).

The jury was allowed to separate at night (CM 298). And again, after all the evidence was in, the jury was permitted to separate for the night over the objection of the defendant (CM 769), and again after all arguments were in (CM 822)."

It is well established that prior to the submission of the case to the jury the trial judge is vested with the sound discretion as to whether to grant a request to sequester the jury and his ruling thereon will not be disturbed on appeal except for abuse of discretion. In those cases where this Court has reversed the trial court, the record affirmatively reflected that as a result of the judge failing to grant a motion to sequester the jury, the defendant was prejudiced thereby by being exposed to hostile crowds, inflamatory newspaper articles, television, or the psychological impact of the presence of many of the relatives of the deceased.

A careful review of the record indicates that the issue was first raised while the jury was in recess during the second day of the trial (CM 98). When the jury took its noon recess on that day they were not allowed to separate (CM 177). When the jury took its afternoon recess defendant's attorney was asked whether he wanted the jury to stay together (CM 230). He responded that he did not (CM 230). The record does not reflect that defendant made any objection to allowing the jury to separate at any of the later recesses (CM 298, 361, 435, 504, 553, 590, 668, 697, 769, 818, 819, 820, 821, 822, 823). Furthermore, on one occasion the record affirmatively reflects that defendant's attorney agreed to an overnight separation (CM 553). As to defendant's contention that the jury was allowed to separate overnight over his objection, it should be noted that on that occasion no objection was made until after the jury had left, and that at that time defendant renewed all of his prior motions (CM 769). He did not specifically object to the separation of the jury.

Although the defendant never made a timely request for sequestration of the jury as reflected from the instances above set forth, and, in fact, during the course of the trial agreed to a jury separation, we have nevertheless reviewed the record and the absence of a timely request being made, for it was seriously contended that the statement of the judge that he would advise the jury who had requested the sequestration, had prevented counsel from making a timely application for sequestration thereafter. The statement of the judge was undoubtedly made as a result of his irritation with counsel for defendant. The judge's irritation was apparently well founded, for counsel apologized to the court. It is readily apparent that counsel was not seriously interested in securing sequestration of the jury prior to the submission of the case to the jury, for the record in the instant case reflects no reluctance on the part of counsel to raise any motions or applications which he deemed important,

nor any reluctance to take exception to the ruling of the trial court. A more serious question would have been presented in the instant case had the trial judge sequestered the jury and advised them that they were being sequestered at the request of counsel for defendant. His statement that he would advise the jury as to who had made the request was made during a moment of irritation, outside the presence of the jury, and undoubtedly both the court and the attorneys were aware that the court had no such intention.

■ From a detailed examination of the record we fail to find anything from which it might be implied that the jury's separation prior to the submission of the case to them, prejudiced the defendant in any way. We must, therefore, hold that this assignment of error is without merit.

■ This leads us to a consideration of the defendant's assignment of error that the State committed fundamental and reversible error when it injected the issue of a lie detector test being given Tommy McGuire, a State's witness. Under this proposition the defendant urges that under the decisions of this Court, the results of a lie detector test are inadmissible and the statement that McGuire, a suspect in the case[1] at the time, had been given the test clearly implied that McGuire was not implicated.[1] While authority is cited by the defendant for the proposition that the results of a lie detector test are inadmissible (See Leeks v. State, 95 Okl.Cr. 326, 245 P.2d 764), no authority is cited for the principal contention urged in this proposition. To put the admission of the statement that the test had been given in proper perspective, we observe that this was introduced in the case only after the defendant had introduced evidence that witness McGuire had made statements tending to implicate himself in the homicide and established that these statements had been reported to the law enforcement officers. It is well to observe that the results of the lie detector test were not mentioned, but alluded to, only to establish that the officers had been diligent in making their investigation of reports called to their attention. The efficacy of using the lie detector as an investigatorial aid, was recognized by this Court in Leeks v. State, supra.

The defendant having failed to support his contention with citations of authority, and after having carefully examined this proposition, we find it also to be without merit.

Under the next two propositions of error, the defendant asserts that the court erred in not informing the jury that contradictory statements, for impeachment purposes, are to be considered for that purpose only, and a witness must be given an opportunity to explain a prior statement.

In this case Joan Looper testified as a witness for the defendant (CM 737–739). In her testimony she testified that Tommy McGuire told her that defendant helped him drag Mr. Sinclair's body into a back room. Also, she testified that Tommy McGuire said that he gave the money to defendant and defendant gave it to Darlene Hill.

She had given a prior written statement concerning what Tommy McGuire had told her. In that statement she had stated that Tommy McGuire did not mention the name of the girl Charles gave the money to. Also, in her statement she had stated that Tommy McGuire said that Charles panicked and ran down the road at the time he, Tommy McGuire, fired the first shot. This statement was introduced into evidence for the purpose of impeaching Mrs. Looper's testimony.

As to the first contention, it should be noted that defendant did not request the court to instruct the jury to the effect that the statement should only be considered for impeachment purposes. Such is of special significance in the instant case because the statement was exculpatory as concerned defendant.

1. It was one of the defendant's principal theories of defense that Tommy McGuire, and not the defendant, had committed the homicide.

■ Defendant relies upon Leeks v. State, supra, in support of this contention. In that case this Court was apparently concerned with the possibility that the jurors might have considered the statements introduced for impeachment purposes as "independent substantive evidence." Such is obviously not the case here because in this case if the jury had considered the statement as "independent substantive evidence," and had believed it, they would have acquitted defendant. Therefore, even if such an instruction should have been given, defendant waived his right to have it given by failing to request it, and such was harmless error under the facts of the present case.

■ As concerns defendant's second contention, it should be noted that at the trial defendant's only objection to the introduction of the statement was on the ground that the witness was not advised of her rights (CM 722). Therefore, defendant waived any other objections which he might have had to the introduction of Mrs. Looper's statement. (See Johnson v. State, Okl.Cr., 380 P.2d 284). Furthermore, defendant could have recalled Mrs. Looper and given her an opportunity to explain any inconsistencies between her testimony and her statement. He did not. We are, therefore, of the opinion that these assignments of error are without merit.

While conceding that an attorney was appointed for defendant and that he was advised of his rights, defendant asserts that his rights were violated because he was questioned in the absence of his attorney after the attorney had been appointed.

■ In several jurisdictions[2] it has been held that even though defendant has appointed or retained counsel, he can still consent to be questioned in the absence of his counsel. In the instant case defendant waived his right to have his attorney present at the time he was being questioned. There was testimony to the effect

that before defendant gave his statement he indicated that he wished to see his attorney, that he was told that that was up to him, and that he then said that he didn't have anything to hide and so he might as well. This conversation was even contained in the statement itself (CM 670). We are of the opinion that the trial court did not err in holding that defendant waived his right to have his attorney present when he gave the statement, and that, therefore, the trial court did not err in allowing the statement to be introduced into evidence.

Defendant contends that his absence during part of the trial is grounds for reversal. In this case a written statement which had been given by defendant was introduced into evidence against defendant. In this statement defendant had stated "and that I was an ex-con." The prosecuting attorney recommended that this phrase be taken out of the statement before it was introduced into evidence. A discussion was had between defendant's attorneys, the prosecuting attorney, and the trial judge, concerning whether or not this phrase should be deleted. After some discussion, a recess was declared. After the recess, and before the jury had returned, the trial judge, defense attorneys, and prosecuting attorney again discussed the matter. The trial judge then ordered that the portion of the statement which referred to the fact that defendant was an "ex-con" be deleted. Defendant was not present at that time. Defendant contends that this constituted a violation of 22 O.S.1961, § 583, which provides in part:

"If the indictment or information is for a felony, the defendant must be personally present at the trial * * *"

■ We are of the opinion that the defendant's absence at the time the phrase was deleted did not constitute a violation of this section. In the present case defendant was not absent while the jury was hearing his case. Also, his presence was

2. State v. Adams, 458 P.2d 558 (Wash., 1969); Dillon v. U. S., 391 F.2d 433 (10th Cir., 1968); Moore v. State, Okl. Cr., 436 P.2d 236.

not essential to a fair and just determination of the question of whether or not the phrase should be deleted. We are further of the opinion that this assignment of error is wholly without merit.

Defendant further contends that comments from State's witnesses that defendant had been in previous trouble is grounds for reversal where the defendant does not testify in his own behalf.

■■■■■■ Darlene Hill testified that defendant visited her apartment between 3:00 a. m. and 4:00 a. m. on September 9, 1968. While she was testifying concerning defendant's actions at her apartment, she made the following statement:

"Well, and then he wanted to stay a little bit and he kept talking and he was telling about the, uh * * * He asked if Mary had told her mother yet that— the trouble that he'd been in before and I said I didn't know, I hadn't talked to Mary that much." (CM 277).

She also made the following statement:

" * * * oh, he just was mostly talking about the trouble he'd been into and how he'd never hurt anybody again and that * * * "

After the next witness had testified, defendant made a Motion for Mistrial based upon the testimony of Darlene Hill. This Motion was overruled. We are of the opinion that defendant waived any objection he might have had to these statements, since he did not object to the remarks at the time they were made and did not move for a mistrial until after the next witness had finished testifying, and never requested that the jury be admonished not to consider the statements. Furthermore, we are of the opinion that the statements were harmless since they did not specifically refer to any prior criminal convictions.

As defendant's last assignment of error, he contends that improper argument of prosecuting attorney may have affected the verdict finding the defendant guilty, and the judgment should be reversed.

The closing arguments of counsel are not set out in full in the record. Certain excerpts from the State's closing argument are set out. These excerpts indicate the prosecuting attorney argued that defendant's statement amounted to a confession (CM 822). It does not appear that any objection was made to these statements at the time they were made (CM 822). However, it does appear that a Motion for Mistrial was made on this ground after the arguments were completed (CM 823).

■■■■ Perhaps it would have been better had the prosecuting attorney referred to it as an exculpatory statement, but the mere fact that it was erroneously referred to as a confession forms no basis for reversal since the defendant's statement had been admitted into evidence and had been referred to several times throughout the trial.

Moreover, the matter was not properly preserved, since no timely objection was interposed and in light of the overwhelming guilt of the defendant, it is obvious that it could not have influenced the jury in their determination.

■■■■ Having concluded that the evidence overwhelmingly supports the verdict that the defendant cold-bloodedly murdered Ervin Clifford Sinclair on September 9, 1968, and the record is free of any error which would justify modification or reversal, the judgment and sentence appealed from should be, and the same is hereby affirmed.

The date originally appointed for the execution of the defendant Charles Edwin Reid having passed pending this appeal, it is ordered, adjudged and decreed by this Court that the judgment and sentence of the District Court of Kay County, Oklahoma, be carried out by the electrocution of the defendant Charles Edwin Reid by the Warden of the State Penitentiary at McAlester, Oklahoma, on Friday, the 15th day of January, 1971.

BRETT, P. J., and NIX, J., concur.