2004 OK CR 31

**Rocky Eugene DODD, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2002–286.

Court of Criminal Appeals of Oklahoma.

Oct. 21, 2004.

An Appeal from the District Court of Oklahoma County; the Honorable Twyla Mason Gray, District Judge.

Catherine Hammarsten, Mitch Solomon, Norman Hollingsworth, Assistant Public Defenders, Oklahoma City, OK, Attorneys for Defendant at trial.

Richard Wintory, Cassandra Williams, Joellyn McCormick, Assistant District Attorneys, Oklahoma City, OK, Attorneys for State at trial.

Wendell B. Sutton, Assistant Public Defender, Oklahoma City, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, Attorneys for State on appeal.

## OPINION

JOHNSON, Presiding Judge:

¶1 Appellant, Rocky Eugene Dodd, was convicted by a jury in Oklahoma County District Court, Case No. CF–94–7724, of two counts of First–Degree Murder, 21 O.S.1991, § 701.7(A). Jury trial was held January 14 through February 13, 2002, before the Honorable Twyla Mason Gray, District Judge. As to each count, the jury recommended the death penalty after having found the existence of two of the four aggravating circumstances alleged by the State: (1) that Appellant had previously been convicted of a felony involving the use or threat of violence to the person, and (2) that Appellant knowingly created a great risk of death to more than one person.[1] Judgment and Sentence were imposed on March 1, 2002, and Appellant timely perfected this appeal.[2]

## A. FACTS

¶2 On the afternoon of Monday, November 7, 1994, the bodies of Shane McInturff and his fiancé, Keri Sloniker, were found lying side by side, face-down in a pool of blood, in the bedroom of their Edmond apartment. Appellant lived in an apartment immediately next door to the victims with his wife, Shelly Dodd, and their infant daughter. Appellant and Shane McInturff were also co-workers at a local business. The bodies were found by Shane's father, Robert McInturff, after Appellant reported that Shane had not shown up for work that day. Appellant accompanied Robert McInturff as he gained entry into the apartment. Upon seeing the bodies, Robert McInturff called for help; emergency personnel and police arrived within minutes.

¶3 Detectives began processing the scene and interviewing witnesses. McInturff and Sloniker had not been seen by anyone since the early morning hours of Sunday, November 6, 1994. They had spent much of Saturday in the company of two friends, Brian Brown and Lisa Way. Brown testified that while at the victims' apartment on Saturday afternoon, he saw Appellant come over and hand McInturff a check for $70.00. McInturff later showed Brown another $70.00 check that Appellant had given him earlier in the day. Brown stated that the checks were payments for methamphetamine that McInturff had supplied to Appellant.

¶4 Later that evening, Brown, Lisa Way, and the two victims went to a local pool hall after smoking marijuana and methamphetamine at the victims' apartment. Lisa Way testified that the victims kept a stash of drugs in a box under their living room couch, and that the box was under the couch when the foursome left to play pool. They arrived at the pool hall at approximately 10:30 p.m. and left at approximately 1:30 a.m. Brown dropped off the rest of the group at the victims' apartment and went home; the victims invited Way to come up and watch a movie and spend the night at their apartment, and Way accepted. Upon entering the apartment, McInturff asked Keri to roll a joint. According to Way's testimony, when Keri pulled the box from under the couch, she saw that the cache of drugs was missing. McInturff became extremely angry and loud, kicking the common wall between his and the Dodds' apartment, and loudly accusing Appellant of stealing the drugs. McInturff then went next door to Appellant's apartment, where a heated exchange took place. Soon after McInturff returned to his apartment, Appellant followed and told McInturff to keep the noise down because his child was trying to sleep.

---

1. The two aggravating circumstances alleged by the State, but not found by the jury, were: (1) that Appellant committed the murders to avoid or prevent lawful arrest or prosecution; and (2) the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.2001, § 701.12.

2. This was Appellant's second trial on these charges; his murder convictions and death sentences resulting from the first trial were reversed by this Court. *Dodd v. State*, 2000 OK CR 2, 993 P.2d 778.

¶ 5 Part of the confrontation between Appellant and McInturff was also witnessed by Dennis Kersh, who lived in an apartment across the breezeway of the small complex. At approximately 2:00 a.m. Sunday morning, Kersh was awakened by a loud noise outside. He then heard someone yell "fuck" from the direction of the victims' apartment. From his window, Kersh saw Appellant run over to the victims' apartment. According to Kersh, as Appellant entered the apartment he yelled, "what the fuck is going on."

¶ 6 According to Lisa Way, after Appellant left the apartment, the victims began discussing a plan to cash the two checks Appellant had given McInturff earlier that day, and tell Appellant's wife that he was still using drugs. They believed this would cause problems for Appellant, because Appellant's wife (who happened to be out of town at the time) had threatened to leave Appellant if she ever found out he was using drugs again. Way decided not to stay the night after all, and left the victims' apartment at about 3:00 a.m. on Sunday. This was the last time anyone saw Shane McInturff and Keri Sloniker alive. Later that Sunday, Brown found McInturff's paycheck in his car. At approximately 5:00 p.m., Brown went by the victims' apartment to return the paycheck, but no one answered when he knocked on the door. Appellant, who was sitting outside his apartment, told Brown he had not seen Shane or Keri that day.

¶ 7 Appellant told police that on the morning of Monday, November 7th, he went by the victims' apartment to give McInturff a ride to work. No one responded to his knocks, and McInturff did not report to work that day. Because the victims did not have a telephone, Appellant left several messages throughout the day on the answering machine of Shane McInturff's parents, expressing concern about Shane and Keri's whereabouts. Appellant was off work and at the apartment complex later that afternoon when Robert McInturff arrived to check on his son. The front door was locked, and Mr. McInturff first tried to enter the apartment through a front window, which the victims were known to routinely leave unlocked; however, the window was locked as well, so

he obtained a key to the apartment from the landlord.

¶ 8 Upon entering the apartment, Mr. McInturff observed two bodies face-down on the bedroom floor. Mr. McInturff testified that he did not turn on the bedroom light and that Appellant remained near the front door. McInturff yelled for Appellant to call 911. Because of the location and position of the bodies, Mr. McInturff stated that he was unable to determine the manner in which Shane and Keri were killed. He noticed that Shane's wallet was lying open in the living room.

¶ 9 The earliest that any of the emergency personnel or police were able to tell the manner in which the victims had been killed was approximately 9:25 p.m. Monday evening, several hours after the discovery, when the bodies were moved for the first time by the medical examiner, who determined that the victims had their throats cut with a very sharp bladed instrument. Before that, the assumption had been that the victims were shot in the head. Appellant was being questioned at the police station at the time the true cause of death was revealed. In a key piece of evidence, Appellant spoke with Dale Ketler, his supervisor at work, at 6:41 p.m. on Monday evening—a half-hour after the bodies had been found—and informed him that Shane and Keri had been murdered and that their throats had been cut. In another key piece of evidence, at work earlier that day, Appellant returned a large, fixed-blade hunting knife that he had borrowed from a co-worker, Al Ames. He left the knife at Ames' workstation, with a note of thanks for getting to borrow the knife and adding that he never had a chance to use it. When news of the murders spread around the workplace on Tuesday, Ames turned the knife and the note over to police.

¶ 10 Investigation of the crime scene revealed trace evidence that someone may have washed blood down the victims' bathroom sink. A missing hand towel from that bathroom was found in the apartment complex dumpster, stained with blood. DNA analysis could not exclude either victim as the source of that blood. Except for the fact that Keri's purse had been dumped out, the victims'

apartment was intact, with nothing of known value taken; Keri's engagement ring was still on her finger. No sign of a weapon was found, and although the victims were positioned as if they might have been bound by the wrists, no ligatures or ligature marks were discovered. No traces of blood were found on the knife Appellant had borrowed from Al Ames. There was no sign of a struggle with the victims or any defensive wounds on their bodies. There was no sign of forced entry, and Robert McInturff had found the front door to the apartment locked. Police found the front window to the apartment unlocked, even though Robert McInturff stated that he had unsuccessfully tried to open that window when he, accompanied by Appellant, first tried to gain access to the apartment late Monday afternoon.

¶ 11 Appellant, Brown, and Way were all questioned by police the night the bodies were discovered. When questioned about the two $70.00 checks that Brown had seen in McInturff's possession, Appellant first claimed he had loaned McInturff money to buy a car from McInturff's uncle, and that McInturff actually returned the checks later Saturday afternoon because the uncle was selling the car to someone else. Appellant claimed that he tore the checks into several pieces and tossed them in the trash. Appellant was apparently unaware that Lisa Way had returned to the victims' apartment early Sunday morning after playing pool, and had seen the two checks at that time. He was also unaware that before she was murdered, Keri Sloniker had entered the two checks into her check register and filled out a deposit slip for them. A search of the apartment complex dumpster revealed trash from Appellant's apartment, but no evidence of the checks. Robert McInturff cast further doubt on Appellant's initial claim when he testified that he had made arrangements to loan Shane money to buy a car from his brother in Arkansas.

¶ 12 At trial, Appellant testified on his own behalf and modified his version of events. First, he admitted that the two $70.00 checks he had written to McInturff were payment for methamphetamine, and not a car loan as he initially claimed. He claimed that when

McInturff's father opened the apartment late Monday afternoon, he (Appellant) saw the checks by McInturff's wallet and took them then. To explain the fact that no evidence of the checks had been found in the dumpster, Appellant again altered his version of events, claiming that he had run back to his own apartment, nauseated upon finding his friends were dead and, while vomiting in the toilet, tore up the checks and tossed them in as well.

¶ 13 At trial, Appellant admitted that he had borrowed a hunting knife from his co-worker, Al Ames, a few weeks before the murders, and returned it the day the bodies were discovered. However, Appellant claimed he did not have access to the knife at the time of the murders, because his wife had traveled out of town for the weekend, and he had placed the knife in the trunk of their car on Friday before she left. In rebuttal, Appellant's wife, Shelly Dodd, testified she was in and out of the car trunk several times that weekend, and that she did not recall seeing Ames's knife therein.

¶ 14 Appellant also offered a new explanation at trial for why he told Dale Ketler that the victims had their throats cut, even though the cause of death was not determined until several hours later. Appellant originally told police that he just assumed a knife had been used because of all the blood surrounding the bodies. At trial, however, Appellant claimed for the first time that he had observed the emergency responders talking with each other at the scene, and saw one of them make a gesture across his throat with his thumb. In rebuttal, the State presented the testimony of the first responding emergency personnel. None of them recalled making any such gesture, and all testified that such a gesture would be highly unprofessional conduct at a homicide scene. One of the first emergency responders also testified that when he first came on the scene and spoke with Appellant, Appellant claimed that he had been playing pool with the victims the previous Saturday night.

¶ 15 During a search of the Dodds' apartment on Monday evening, police seized a number of items, including a pair of wet blue jeans and a copy of the "Anarchist Cook-

book," which Brian Brown had lent to Appellant and which describes, among other things, how to kill a person efficiently with a knife by cutting their throat. In his testimony, Appellant could give no explanation for the wet jeans. Martin Mullins, Appellant's father-in-law, testified that Appellant had done laundry at his home on the afternoon of Saturday, November 5; the Dodds' apartment did not have a washer or dryer. Mullins did not recall Appellant returning to his apartment with any wet clothing that afternoon, which was two full days before the wet jeans were seized. Shelly Dodd testified that she did not hand-wash any jeans after she returned from her weekend trip on Sunday evening.

¶ 16 According to Mullins, while Appellant's laundry was washing and drying, on Saturday afternoon, Appellant spent his time shooting a crossbow pistol in Mullins' backyard and sharpening several hunting knives that Appellant had brought over with him. Mullins recalled that Appellant had brought a folding-blade knife and a fixed-blade knife to his home for sharpening. The knife Appellant had borrowed from Ames was a fixed-blade knife, and detectives found it to be very sharp when they obtained it. According to police, the only fixed-blade knife found in Appellant's apartment had a dull blade, suggesting that he did not, in fact, sharpen that knife at Mullins' home on the Saturday before the murders. At trial, Appellant claimed he only sharpened two folding-blade knives at Mullins' home.

¶ 17 Mullins also testified that after Appellant was arrested and charged with the murders, he helped his daughter move out of the apartment. While packing, Mullins said, he found several magazines devoted to photos and articles about how to kill people, including one that, according to Mullins, had a cover story about "How to cut your target's throat and leave no evidence." Shelly Dodd's cousin, Malinda Anderson, testified that she had seen similar magazines in the Dodds' bedroom in mid–1993, when she and her husband spent the night there.

¶ 18 As noted, Appellant testified on his own behalf at trial, and denied any participation in the murders. He also presented expert testimony suggesting that it would have been unlikely that one person could have subdued two victims without having to restrain either of them with some sort of binding. Additional facts will be presented as they become relevant to our discussion of the issues below.

## B. DEFENDANT'S RIGHT TO BE PRESENT DURING PROCEEDINGS

■ ¶ 19 In Proposition 19, Appellant claims he was denied his right to be present at all critical stages of the trial proceedings. To support this claim, he points to various pretrial motion hearings and status conferences, and to one *in camera* hearing during trial, where he was not physically present. At some of these hearings, Appellant's trial counsel purported to waive the necessity of his appearance. Appellant claims the record is insufficient to show that he personally waived his right to be present at these hearings.

■ ¶ 20 The "right to be present" that Appellant claims was violated is rooted primarily in the defendant's Sixth Amendment right to confront the witnesses against him. The Fifth Amendment right to due process may also be implicated, if Appellant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself.[3] *See United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 332, 333, 78 L.Ed. 674 (1934). The defendant's right to be present "at the trial" is also protected by statute. 22 O.S.2001, § 583; *Ryder v. State,* 2004 OK CR 2, ¶ 29, 83 P.3d 856, 864; *Perry v. State,* 1995 OK CR 20, ¶ 25, 893 P.2d 521, 527–28. The specific constitutional sources of this "right to be present" reveal its limitations. An accused does not have an absolute constitutional right to be present at every *in camera* discussion between court and counsel, even during the

---

3. Of course, a defendant may voluntarily absent himself from proceedings by doing such things as expressly waiving his right to be present, committing disruptive conduct which results in his removal, or intentionally failing to appear. None of those situations are presented here.

trial itself. *Davis v. State*, 1988 OK CR 153, ¶ 12, 759 P.2d 1033, 1036. Nor does the statutory right to be present "at the trial" extend to *in camera* hearings or other matters outside the jury's presence. *Reid v. State*, 1970 OK CR 149, 478 P.2d 988, 999–1000, *modified* 507 P.2d 915.

¶ 21 All of the hearings Appellant refers to, save one, occurred before trial. Most of these were nothing more than status conferences between the court and counsel. Two dealt with purely legal issues where no testimony was taken. At the one hearing Appellant complains of which occurred during trial, the court and counsel reviewed proposed second-stage evidence outside the jury's presence. Appellant was never denied his right to confront witnesses. He was present during all proceedings before the jury. He does not allege, much less demonstrate, that his ability to defend himself was in any way compromised by his absence at these proceedings.[4] *See Reid, id.* (no error where defendant's presence at *in camera* hearing was not essential to a fair and just determination of the matters discussed). This proposition is denied.

## C. JURY SELECTION ISSUES

 ¶ 22 In Proposition 10, Appellant claims error in the trial court's decision to remove Mr. Garcia from the panel of prospective jurors because of his position concerning the death penalty. In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that only prospective jurors who express conscientious scruples against the death penalty, *and* who would not impose the death penalty under any set of circumstances, could be excused from the jury panel for cause. The decisive issue is not simply whether the panelist has personal reservations about the death penalty, but whether the panelist can set aside such reservations and follow the law—in other words, whether the panelist's views "prevent or substantially impair the

performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). This standard does not require that a prospective juror's incompetence to serve be established on the record with "unmistakable clarity." *Id.* at 424–25, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. We must give great deference to trial judges in matters regarding jury selection. *See Patton v. State*, 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281–82, *cert. denied*, 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999); *Ledbetter v. State*, 1997 OK CR 5, ¶ 4, 933 P.2d 880, 885.

 ¶ 23 Appellant claims the trial court removed Mr. Garcia merely for a "generalized opposition to the death penalty," and describes Mr. Garcia's views on the death penalty as "equivocal." The record shows otherwise. While panelists were being asked about any medical conditions that might affect their service, Mr. Garcia volunteered to the court that he was opposed to the death penalty. The court gave Mr. Garcia additional time to think about the subject. After completing her inquiry about panelists' medical issues, the court returned to Mr. Garcia and asked if he had had time to consider the issue of capital punishment more fully. Mr. Garcia reiterated that he was opposed to the death penalty. The trial court inquired further: "So, Mr. Garcia, your position about the death penalty, if I understand it, is such that regardless of the facts and circumstances of this particular case, you would not consider imposing a punishment of death?" Mr. Garcia replied, "Correct." The trial court's question was clear and appropriate, and Mr. Garcia's response was positive and made after being given time for further consideration. By reiterating that he could not consider the death penalty under any circumstances, Mr. Garcia was telling the trial court that he could not put aside his beliefs and follow the law and the court's instructions. *Douglas v. State*, 1997 OK CR 79, ¶ 8, 951

---

4. The cases Appellant relies on are inapposite, as they dealt with the defendant's ability to either confront witnesses or otherwise be present at proceedings before the jury. *Compare Carter v. Sowders*, 5 F.3d 975, 980–82 (6th Cir.1993) (error where record failed to establish that defen-

dant knowingly waived right to be present for deposition which was used at his trial); *Larson v. Tansy*, 911 F.2d 392, 394–97 (10th Cir.1990) (error where record did not include defendant's personal waiver of right to be present during the trial court's charge to the jury).

P.2d 651, 660, *cert. denied,* 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998). The trial court did not abuse its discretion in excusing this panelist. Proposition 10 is denied.

¶ 24 In Proposition 11, Appellant complains that his jury was tainted when the prosecutor "indoctrinated" prospective jurors about circumstantial evidence. The prosecutor inquired generally about the kinds of evidence the panelists would find helpful, if not essential, in any criminal case. He stayed clear of mentioning the particulars of the evidence that the State actually intended to present. Appellant cites no authority for his claim that the prosecutor's manner of questioning was improper. The purpose of *voir dire* is to determine whether there are grounds to challenge prospective jurors, for either actual or implied bias, and to permit the intelligent exercise of peremptory challenges. *Walker v. State,* 1994 OK CR 66, ¶ 12, 887 P.2d 301, 307, *cert. denied,* 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). The prosecutor had a right to find out if any prospective jurors were unable, either as a matter of principle or simple misunderstanding, to give circumstantial evidence the same weight accorded to direct evidence, as the law would require them to do. *See* OUJI–CR (2nd) No. 9–4. In fact, as the State points out, the discussion revealed that one panelist simply could not follow the law in this regard, and she was later excused by the State with a peremptory challenge. We find no error here. Appellant also claims that a presumption of guilt was built around him because portions of the prosecutor's discussion occasionally referred to a hypothetical perpetrator as the "defendant." Having read the entirety of the exchanges in context, we find nothing improper. *Dennis v. State,* 1994 OK CR 34, ¶ 24, 879 P.2d 1227, 1233–34. This proposition is denied.

## D. GUILT–STAGE EVIDENTIARY ISSUES

### 1. Admissibility of evidence obtained pursuant to Appellant's questioning and consent to search

¶ 25 In Proposition 5, Appellant contends that physical evidence taken from his apartment, and statements made by him during police questioning, were the product of an illegal arrest and should have been suppressed under the Fourth Amendment to the United States Constitution and Article II, § 30 of the Oklahoma Constitution. First, Appellant claims that his decisions to go to the police station, answer questions, and then consent to a search of his apartment were all involuntary. Alternatively, he claims that all the information police had prior to his formal arrest hours later, even if obtained lawfully, was insufficient to establish probable cause. We disagree on both counts.

¶ 26 On the evening of November 7, police were processing the crime scene and interviewing potential witnesses, among them Brian Brown, who told police about Appellant bringing McInturff two checks on Saturday afternoon, and Lisa Way, who told police about the altercation between McInturff and Appellant later that night. Based on this and other information, police decided they wanted to interview Appellant, who was present when the bodies were discovered, lived next door to the victims, and was watching the crime scene investigation all evening. Whether Appellant was "under arrest" when police asked to question him depends on whether a reasonable person in his circumstances would have felt free to decline the officers' request. *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991). While the ultimate test is an objective one, we may consider the motivations and subjective impressions of the participants. *See e.g. McCarty v. State,* 1995 OK CR 48, ¶ 36, 904 P.2d 110, 121.

¶ 27 Appellant claims that when the officers asked him to come in for questioning, they had already picked him as a target of suspicion, in part because of his prior record of criminal violence. Appellant ignores that police had also asked Brian Brown and Lisa Way to come down to the station for questioning. At the suppression hearing, the officers testified that when asked if he would accompany them for additional questions, Appellant freely agreed. Appellant did not testify at the hearing, and although his counsel explored the officers' motives for wanting to question him further, Appellant presented

no evidence that he was forced, coerced, or intimidated into traveling to the police station. (In fact, at trial, Appellant testified that he freely accompanied the police to the station.) Considering the testimony at the suppression hearing, we have no difficulty concluding that a reasonable person in Appellant's situation would not have felt forced to comply with the officers' request. *McCarty*, 1995 OK CR 48, ¶ 36, 904 P.2d at 121. Once at the police station, Appellant was advised of his right to silence, and agreed to answer questions anyway. He also signed a formal consent to allow police to search his home. Again, after reviewing the transcript of the suppression hearing, we find no evidence of compulsion. *Hommer v. State*, 1983 OK CR 2, ¶¶ 10–14, 657 P.2d 172, 175. Appellant's decisions to submit to questioning and to a search of his apartment were voluntary.

 ¶ 28 The police had probable cause to place Appellant under arrest after searching his apartment and returning to the police station. By that time, police had also talked with Brown and Way, and Appellant's account of the events of November 5–6 was at odds with their statements about the checks he had written to McInturff and what they were for. Appellant was apparently unaware that Way was with the victims later that evening and had seen the checks in the victims' apartment hours after Appellant claimed McInturff had returned them.

¶ 29 The checks were not found at the crime scene, but Sloniker's deposit slip, referring to them, was. Furthermore, Appellant told Detective Fike during pre-arrest questioning that from standing in the front doorway of the victims' apartment, he "figured" the victims' throats were cut; Fike, who had personally been at the scene, testified that Appellant could not have determined this from his vantage point, and that in fact, police surmised the victims had died from gunshot wounds to the head until later Monday evening—after Appellant was already at the police station—when the Medical Examiner was the first to turn the bodies over. Further still, Detective Fike testified that a patch of skin on Appellant's forearm

appeared to have been shaved with a sharp object.

¶ 30 Reviewing the totality of the evidence known to them at the time, we find that the police had probable cause to arrest Appellant. *Mollett v. State*, 1997 OK CR 28, ¶ 13, 939 P.2d 1, 6–7, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998). This proposition is denied.

**2. Evidence and instructions relating to Appellant's post-offense suicide attempt**

 ¶ 31 In Proposition 2, Appellant alleges error in the admission of evidence and argument relating to his post-arrest suicide attempt; in Proposition 3, he alleges that the trial court's instruction to the jury on how to evaluate this evidence was confusing. Approximately a month after his arrest, Appellant attempted suicide in his jail cell. Before committing the act, Appellant wrote letters to his wife and family, despairing of his situation but maintaining his innocence of the crimes. He then cut his neck several times with a razor blade. Appellant quickly had a change of heart and called for help; he was found lying face-down on his bunk. Appellant suffered substantial blood loss and was taken to a hospital where he underwent surgery. While recovering from his wounds, Appellant told an officer, "They're going to kill me anyway, man. I have no witnesses, no alibi, I'm an ex-convict, they don't believe me anyway, I'm a manic depressive and I just don't care."

¶ 32 Evidence of Appellant's two letters, and the circumstances surrounding the suicide attempt, were admitted into evidence over Appellant's objection. Appellant had moved *in limine* to exclude this evidence. The State argued that Appellant's suicide attempt was relevant as tending to show his consciousness of guilt, *i.e.* his identity as the perpetrator of the murders. Appellant responded that the evidence was too ambiguous to have any probative value. Both parties maintain these arguments on appeal. Because Appellant timely objected to the evidence in question, he has preserved any error for appellate review. *Bryan v. State*, 1997 OK CR 15, ¶ 33, 935 P.2d 338, 357.

¶ 33 The parties cite no Oklahoma authority directly addressing the admissibility of such evidence, and we are aware of none. Both parties draw analogies between evidence of a defendant's post-offense attempted suicide and evidence of a defendant's flight. "Flight" is a term of art most appropriate to describe evidence of the defendant's departure from the crime scene shortly after the commission of the offense. Flight evidence is but one category of post-offense conduct, sometimes referred to as "admissions by conduct," which may be relevant to show the defendant's consciousness of guilt, i.e., his identity as the perpetrator of the charged offense. Although admissions by conduct do not always constitute evidence of other crimes, wrongs, or bad acts, see 12 O.S.2001, § 2404(B), the two often overlap. See generally Anderson v. State, 1999 OK CR 44, ¶¶ 10–15, 992 P.2d 409, 416.

¶ 34 In a variety of contexts, we have long held such evidence is admissible on the issue of identity or "consciousness of guilt." For example, evidence that the defendant has intimidated, threatened, or attempted to bribe witnesses who might be called to testify against him for the original offense is generally admissible. See e.g. Powell v. State, 2000 OK CR 5, ¶ 66, 995 P.2d 510, 527 (intimidating witness to change testimony); Gideon v. State, 1986 OK CR 112, ¶ 10, 721 P.2d 1336, 1338 (threatening witness to "drop charges"); Wills v. State, 1981 OK CR 140, ¶¶ 9–10, 636 P.2d 372, 375–76 (attempting to bribe witness to not appear in court). Evidence that the defendant attempted to alter or destroy physical evidence also admissible. Paxton v. State, 1993 OK CR 59, ¶ 12, 867 P.2d 1309, 1317, cert. denied, 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). Evidence that the defendant attempted to escape confinement, conceal himself, alter his appearance to avoid detection, or otherwise tried to evade judicial proceedings may also be relevant to show consciousness of guilt. See e.g. Honeycutt v. State, 1988 OK CR 76, ¶ 19, 754 P.2d 557, 561 (defendant jumped bail); Smith v. State, 1985 OK CR 15, ¶¶ 15–17, 695 P.2d 1360, 1363 (defendant attempted to bribe jailer and failed to appear for trial); Almerigi v. State, 17 Okl.Cr. 458, 464, 188 P. 1094, 1096 (1920) (defendant altered his physical appearance). Whether it amounts to immediate departure from the crime scene, subsequent failure to subject himself to legal process, or any attempt to otherwise influence the proceedings against him, a defendant's post-offense conduct may be relevant to establish his identity as the perpetrator of the original offense.

¶ 35 Turning to the particulars in this case, we find the evidence of Appellant's attempted suicide was relevant as it tended to show his consciousness of guilt, and the identity of the perpetrator was the primary contested issue in the case. Appellant contends it would have been just as reasonable for the jury to infer that Appellant attempted suicide "out of despondency due to a fear of being unable to prove his innocence." We certainly agree that an innocent inference could be supported by Appellant's own testimony about his depression, the substance of the letters he wrote before the attempt, and the statements he made after it. But Appellant has confused the admissibility of this particular evidence with its sufficiency to support a conviction by itself.

¶ 36 The fact that a particular piece of evidence is subject to varying interpretations does not, by itself, render it inadmissible. Relevant evidence is almost always subject to alternative interpretations. Such considerations are normally for the jury to consider. A defendant's post-offense conduct is relevant if it tends in any degree to show consciousness of guilt, and should not be excluded unless it concerns matters that would overshadow the issues in the case and distract the jury into punishing the defendant simply for being a bad person. See 12 O.S.2001, §§ 2401–04. Suicide may be morally offensive to some, but we do not believe it tends to characterize the person attempting it as a morally bad person who deserves to be punished; and it certainly is not an act of such inflammatory nature as to distract the jury from the issues before it.

¶ 37 Moreover, the manner in which Appellant tried to end his life was, in the State's estimation, of greater significance than the attempt itself. Appellant used a razor blade to make two cuts to his neck. The cuts were

deep enough to cause significant bleeding, and Appellant almost bled to death before authorities rescued him. The victims in this case bled to death under similar circumstances, and the prosecutor argued that Appellant's conduct showed he had the "mental toughness" to "put cold steel to a living throat." The similarity between the way in which the victims were killed, and the way in which Appellant attempted to kill himself, was something the jury was entitled to consider for whatever weight it might deserve.

■ ¶ 38 We have long held that in order to be relevant, evidence need not conclusively, or even directly, establish the defendant's guilt. "Any legal evidence from which the jury may adduce the guilt or innocence of the defendant is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue." *Ashlock v. State*, 1983 OK CR 134, ¶ 7, 669 P.2d 308, 310; see also 12 O.S.2001, § 2401. The evidence was properly admitted, and prosecutorial commentary on inferences which might be drawn from it was permissible.

¶ 39 Because we find the evidence of Appellant's suicide attempt admissible, we need only consider whether the jury instruction regarding it was so confusing as to have misled the finder of fact. We first note that the instruction was prepared by defense counsel and given without objection by the State or modification by the court. Appellant now argues that the trial court erred in giving the instruction that his attorney crafted because he never denied attempting suicide, and because he never admitted committing the murders. These considerations are derived from language in cases dealing with evidence of a defendant's flight from the scene of the crime. We have held that flight instructions are improper if they (1) presume, as a matter of law, that unexplained departure from the crime scene demonstrates consciousness of guilt, *see Wilson v. State*, 96 Okl.Cr. 137, 139–140, 250 P.2d 72, 74–75 (1952); or (2) assume that the person leaving the scene was the defendant, when that fact is in dispute, *see Mitchell v. State*, 1993 OK CR 56, ¶ 13, 876 P.2d 682, 685. In either case, the court has invaded the prov-

ince of the jury to determine the facts, and the conclusions to be drawn from them.

¶ 40 Those concerns are not relevant here. The identity of the person committing the post-offense conduct—in this case, the suicide attempt—was not in dispute. Nor was the jury told to presume anything about Appellant's conduct. The jury was instructed that it alone should determine whether Appellant's conduct in cutting his own throat was done with both a consciousness of guilt and a desire to avoid punishment, and if so, what weight, if any, should be attached to that evidence. We find the instruction, submitted by defense counsel, was sufficiently clear and fairly stated the applicable law. *See Roldan v. State*, 1988 OK CR 219, ¶ 10, 762 P.2d 285, 287; *Saugstad v. State*, 1982 OK CR 26, ¶ 10, 642 P.2d 616, 618. Propositions 2 and 3 are denied.

3. **Exclusion of evidence relating to victims' bad character and the possibility of alternative suspects**

■ ¶ 41 At trial, Appellant proffered evidence concerning Shane McInturff's drug purchases, gambling activities, and financial worries in the months preceding his death. This, along with various other pieces of evidence, was offered in the guilt stage to show the possibility that someone else may have killed the victims, and was re-offered in the punishment stage to counter evidence of McInturff's good character as presented by the victim impact witnesses. The trial court refused to admit this evidence in either stage of trial. In Proposition 6, Appellant claims the exclusion denied him his constitutional rights to confront witnesses and present a defense. We disagree.

■ ¶ 42 Questions concerning the relevancy of particular evidence are within the discretion of the trial court, and its resolution of those issues will not be disturbed absent a clear showing of abuse, accompanied by prejudice to the accused. *Dennis v. State*, 1994 OK CR 34, ¶ 15, 879 P.2d 1227, 1232. Regarding evidence of alternative suspects, we have held:

> [E]vidence offered to show that some other person committed the crime charged must connect such other person with the fact;

that is some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused.... [It is] not enough to show a possible motive on the part of another; the evidence must show an overt act by the third person toward the commission of a crime.

*Woodruff v. State,* 1993 OK CR 7, ¶ 47, 846 P.2d 1124, 1137, *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

¶ 43 The evidence proffered by the defense not only failed to establish an overt act by a third party, but more fundamentally, it failed to establish an identifiable third party with a motive to harm either McInturff or Sloniker. The defense proffered several pieces of evidence, but the more specific one item was, the more likely it was inconsistent with others. In addition, the State made its own proffer, and from the representations of the prosecutor at the pretrial motion hearing (which were not contested by the defense), it appears that investigation along these alternative lines actually dispelled most of the suspicions raised by the defense's proffer. Taken as a whole, the proffered evidence suggested only that Shane McInturff's drug use and gambling could have caused him to be on bad terms with any number of people. Because the evidence did not point in any particular direction or to any particular person, it amounted only to evidence of the victim's bad character, and as such, was inadmissible in the guilt stage of trial. *See Conover v. State,* 1997 OK CR 6, ¶¶ 25–27, 933 P.2d 904, 912. Because the proffered evidence was ambiguous and entirely speculative as to a potential alternative suspect, the trial court did not abuse its discretion in excluding it from the guilt stage of trial to avoid confusion of the issues. 12 O.S.2001, §§ 2401–03; *Romano v. State,* 1993 OK CR 8, ¶ 45, 847 P.2d 368, 381, *aff'd.,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

¶ 44 We also reject Appellant's claim that barring this evidence violated his constitutional right to fair trial, because it prevented him from mounting a defense. Appellant has not demonstrated that the general rules of relevancy, codified in our Evidence Code,

worked to deny him this right. Appellant was simply barred from presenting what, in the trial court's discretionary determination, did not tend to be probative of any fact in issue. And in fact, Appellant was able to present evidence and argument on many of the subjects he lists as alternative-suspect evidence. For example, the jury was made aware that the victims possessed paraphernalia not only for ingesting drugs, but for distributing them as well. Expert testimony showed that some DNA recovered from the bloody hand towel did not match either victim or Appellant, and that numerous latent fingerprints lifted from the crime scene did not match either the victims or Appellant. In addition, Appellant presented expert testimony as to the unlikelihood that a lone assailant could have held two victims in submission without restraining them in some manner, and testimony was presented that the manner of killing was reminiscent of gang violence. Thus, Appellant was permitted, within the parameters of the Evidence Code, to advance and attempt to support his claim that a reasonable doubt existed that he was the perpetrator.

¶ 45 Nor do we agree with Appellant that any of this proffered evidence became admissible in the punishment stage to counteract impressions left by the victim impact testimony. Some it was simply not relevant to the victims' character. The rest was cumulative, and even if it was admissible in the punishment stage to give additional details of the victims' bad character, any error in its exclusion was harmless beyond a reasonable doubt. *Compare Conover,* 1997 OK CR 6, ¶¶ 77–80, 933 P.2d at 922–23 (trial court erred in preventing defense from counteracting victim impact evidence of victim's good character with evidence of his drug use). The jury was well aware from the evidence presented in the guilt stage of trial that the victims were involved in purchasing, using, and selling illegal drugs. The victims' secret involvement with drugs was acknowledged by some of the family members testifying as victim impact witnesses. We do not believe the jury's impression of the victims would have been materially altered by additional evidence that McInturff liked to gamble, or

by specific instances of his drug purchases. This proposition is denied.

### 4. Admission of hearsay and evidence of Appellant's other bad acts

¶ 46 In Proposition 7, Appellant challenges various statements introduced at trial on grounds that they constituted inadmissible hearsay and/or improper other-crimes or bad-acts evidence.

¶ 47 The State presented evidence that Appellant had been obtaining methamphetamine from McInturff in the months preceding the murders. The State endeavored to show that the murders were motivated by Appellant's fear that McInturff was about to reveal Appellant's drug use to Appellant's wife. Most of this evidence came from Brian Brown and Lisa Way. At the outset, we note that with regard to most of the testimony concerning various statements McInturff made to them, or made in their presence, Appellant failed to lodge a contemporaneous objection, or objected on technical grounds not relevant here.

¶ 48 Over a defense hearsay objection, Brian Brown testified that McInturff had once said Appellant owed him (McInturff) about $800 for drugs. According to Brown, McInturff suspected Appellant of breaking into his apartment in early 1994 and stealing his cache of drugs. Lisa Way gave similar testimony. Brown testified that on November 6 he observed Appellant come to the victims' apartment and deliver a check, which McInturff placed in his wallet. After Appellant left, McInturff opened his wallet and showed Brown the $70 check, along with a second check, also from Appellant and for the same amount. Brown testified that Appellant was repaying McInturff for "crank," or methamphetamine. Brown testified that on the day Appellant have him the two $70 checks, McInturff said he was considering giving the checks to Appellant's wife and "letting her know of some things going on." When asked what that meant, Brown replied, "Drug use." Brown testified that he advised McInturff to cash the checks quickly "while [Appellant has] still got the money to back up the checks." With no objection by the defense,

Brown testified that McInturff "seemed a little angry about Rocky owing him money."

 ¶ 49 Brown's testimony that Appellant owed McInturff approximately $800 for drugs was hearsay, and was met with a timely defense objection on those grounds. Brown had no personal knowledge of how much money, if any, Appellant owed McInturff, and the State's explanation for why the statement was admissible necessarily assumed that it was true. Moreover, the statement was made months before the murders, so its relevance as to the amount of money allegedly owed is questionable. However, we cannot say this error prejudiced Appellant, given other evidence, particularly Appellant's own testimony, that he had been buying methamphetamine from McInturff for some time before the murders. *Smith v. State*, 1985 OK CR 17, ¶ 9, 695 P.2d 864, 867.

 ¶ 50 Because it referred to his own observations, Brown's testimony that on the afternoon of Saturday, November 5, he saw Appellant deliver one check to McInturff, and saw a second check from Appellant in McInturff's wallet, was not hearsay. *Omalza v. State*, 1995 OK CR 80, ¶ 19, 911 P.2d 286, 297. Moreover, there could be no prejudice because Appellant admitted giving McInturff two checks that afternoon, and eventually admitted they were for drugs. Brown's own advice to McInturff as to why he should cash the checks quickly was not hearsay, as it did not rely on the truth of any other statement by any other declarant; as we read the testimony, Brown's advice was offered regardless of whether McInturff intended to tell Shelly Dodd about Appellant's drug use.

 ¶ 51 McInturff's statements professing a belief that Appellant had stolen money and drugs from his apartment earlier that year were not hearsay, because they were not offered to prove that Appellant had, in fact, committed the theft, and did not depend on the truth or falsity of that claim. Rather, they were offered to explain McInturff's reaction, specifically his anger toward Appellant, when he realized someone had stolen his drugs again on the night of November 6, 1994. McInturff's accusation that

Appellant had stolen his drugs on November 6 was not offered for its truth. McInturff's anger was based solely on his *suspicion* that Appellant was the culprit, and while that anger may have played a part in McInturff's motivation to threaten to reveal Appellant's drug use to his wife, it was McInturff's threat—not Appellant's actual guilt or innocence as to the theft—that provided a motive for Appellant to kill. *See* 12 O.S.2001, § 2801(A); *Omalza,* 911 P.2d at 297. Even if this evidence suggested other crimes or wrongs possibly committed by Appellant, it was otherwise admissible for the reasons just specified, and its probative value in tending to establish a motive for the murders was not substantially outweighed by its prejudicial effect. 12 O.S.2001, §§ 2404(B), 2803(3).

¶ 52 Brown was asked on direct examination whether McInturff had ever described any "obscure or weird" behavior on Appellant's part. Brown testified that at some unspecified time before the murders, McInturff told him of an incident where Appellant and McInturff had gone driving; upon passing by an amusement park, Appellant allegedly got out of the car, pointed a gun in the direction of the park's Ferris Wheel, and fired several shots. According to Brown, McInturff said this incident put him in fear of his life. When the defense promptly objected to this testimony as hearsay and irrelevant other-crimes evidence, the State argued that it was admissible as it tended to show McInturff's "state of mind." *See* 12 O.S.2001, § 2803(3). The trial court agreed, without first determining exactly what testimony was anticipated.

¶ 53 Section 2803(3) of the Evidence Code permits statements made by an out-of-court declarant which show the declarant's state of mind, but it specifically bars "statement[s] of memory or belief to prove the fact remembered or believed." If the State intended only to show that McInturff was afraid of Appellant, then that expression of fear was not hearsay; however, the details supporting that fear were hearsay, because McInturff's fear necessarily depended on whether the incident occurred—that is, the truth of the matter asserted.

¶ 54 The larger question, however, is the relevance of the ultimate fact that the State claimed it was trying to establish—McInturff's alleged fear of Appellant. Nothing about the State's theory of the case depended on such fear. McInturff continued to fraternize with Appellant and sell him drugs. Indeed, McInturff's anger and confrontation with Appellant over the missing drugs, and his threats to report Appellant's drug use to his wife, were apparently not dampened by any fear on McInturff's part. *See Wadley v. State,* 1976 OK CR 178, ¶ 10, 553 P.2d 520, 523 ("[W]here hostile emotions at a particular time are to be proved in a case, the existence of the *same emotion* in the same person at another time is proper evidence") (emphasis added). Even if the alleged Ferris Wheel incident did give McInturff pause, that fact simply was not relevant to the issues in this case. Rather, the obvious point of this evidence was to portray Appellant as generally a bad person with "obscure or weird" behavior, a person with little regard for human life. As such it was improper bad-character evidence, which had no visible connection to the murders, and the trial court should not have admitted it. 12 O.S. 2001, §§ 2401-04; *Rushing v. State,* 1984 OK CR 39, ¶ 44, 676 P.2d 842, 850-51.

¶ 55 Whether there is a reasonable possibility that this evidence affected the outcome of the trial, however, is a separate question. From evidence properly admitted at the guilt stage of trial, the jury was aware that Appellant had a collection of knives and other lethal weaponry, had a borrowed copy of "The Anarchist Cookbook" which described efficient ways of killing people, had his own collection of magazines describing how to kill people (discussed in Proposition 8), and had a violent criminal history beginning at an early age. Unlike the indiscriminate flavor of the alleged Ferris Wheel incident, the murders in this case involved a very personal assault with an identifiable motive. The jury was instructed that evidence of Appellant's other crimes or bad acts was not offered merely to show he acted in conformity therewith. Considering the other character evidence which was properly admitted at trial, we find this error was harmless beyond a reasonable

doubt. *Welch v. State*, 2000 OK CR 8, ¶ 29, 2 P.3d 356, 370.

### 5. Admission of evidence of homicide literature in Appellant's home

¶ 56 In Proposition 8, Appellant objects to trial testimony concerning "homicide magazines" found in his apartment. Appellant's father-in-law, Martin Mullins, testified that about a week after Appellant's arrest, while he helped his daughter move out of the apartment, he found several magazines in Appellant's bedroom which were, as he put it, "related to murder and how to do it." One of the magazines had a photograph with the caption, "How to cut your target's throat and leave no evidence." The magazines themselves were not introduced into evidence; Mullins testified that he had thrown them away when cleaning the apartment, under the assumption that police had already seized everything they felt was relevant. Mullins first told prosecutors about his find in early January 2002—over seven years after the murders, and only about a week before this trial began. Mullins's testimony about the magazines was, however, corroborated to some degree by the testimony of Malinda Anderson, Shelly Dodd's cousin, who stated that she saw similar magazines in the Dodds' bedroom in mid–1993. Anderson discussed her find with Mullins in 1995, but prosecutors were unaware of her information as well until January 2002.

¶ 57 Appellant claims that this testimony should have been excluded, because (1) the State lacked diligence in obtaining it, (2) the State failed to notify defense counsel about it within ten days before trial, and (3) it was unfairly prejudicial. We disagree. The Criminal Discovery Code, 22 O.S.2001, § 2001 *et seq.*, provides for fair disclosure of evidence anticipated to be used at trial. Generally, disclosure within ten days of trial is required. 22 O.S.2001, § 2002(D). The parties are under a continuing duty promptly to disclose any newly-discovered information they anticipate using at trial. 22 O.S.2001, § 2002(C). Given that the Code specifically contemplates the possibility of new evidence becoming available even after trial has begun, *see id.*, evidence that is discovered less than ten days

before trial is not automatically excluded; the opposing party simply must be given a fair opportunity to prepare for its admission. *See* 22 O.S.2001, §§ 2002(D), (E)(2).

 ¶ 58 The record indicates that the prosecutors promptly informed defense counsel of the newly-discovered evidence on January 7, 2002, about a week before trial began. There is nothing in the record to suggest that the State knew about and deliberately withheld the evidence prior to that date. Defense counsel had ample opportunity to prepare for it, given that jury selection consumed the first two weeks of trial; the testimony was actually presented to the jury some twenty-five days after the defense was notified.

 ¶ 59 Defense counsel objected when the testimony was offered; counsel admitted receiving the State's supplemental discovery notice before trial; counsel did not claim, much less demonstrate, either an inability to prepare for the evidence or lack of diligence on the State's part in obtaining or relaying it. We find no misconduct on the part of the State, and no unfair prejudice to Appellant. *See Powell v. State*, 2000 OK CR 5, ¶ 62, 995 P.2d 510, 526, *cert. denied*, 531 U.S. 935, 121 S.Ct. 321, 148 L.Ed.2d 258. Given the manner in which the victims were killed, the testimony was relevant and not unfairly prejudicial. 12 O.S.2001, §§ 2403–04. *Cf. Slaughter v. State*, 1997 OK CR 78, ¶¶ 22–27, 950 P.2d 839, 849–850, *cert. denied*, 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998). This proposition is denied.

### 6. Admission of testimony regarding crime-scene bloodstains

¶ 60 In Proposition 4, Appellant complains that expert testimony regarding bloodstains found at the crime scene was improperly admitted. Douglas Perkins, a forensic specialist with the Oklahoma State Bureau of Investigation, testified about the results of luminol tests conducted at the crime scene, primarily in and around the bathroom sink. Perkins and forensic specialist Tom Bevel testified about a blood swipe found on the bottom of Keri Sloniker's right foot, and comparisons between its shape and the dimensions of Al Ames's hunting knife. Prior

to trial, Appellant moved to exclude evidence regarding luminol testing, because of the limitations inherent in the procedure and perceived deficiencies in its use in this particular investigation. The trial court denied the motion. Appellant did not renew his objections when either Perkins or Bevel testified, so we review only for plain error. *Simpson v. State,* 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693.

¶ 61 Perkins testified to finding possible traces of diluted blood in the victims' bathroom sink. The presence or absence of blood in the sink was never conclusively determined. Perkins also testified that the blood swipe on Sloniker's foot was not inconsistent with the dimensions of Ames's hunting knife, but it was inconsistent with the shape of knives found in Appellant's apartment. The State's theory was that after murdering his victims, the perpetrator wiped blood off the murder weapon onto the bottom of Sloniker's foot, walked into the bathroom, and washed himself and/or the weapon at the sink. A hand towel from the victims' bathroom was found in the apartment complex dumpster, and a drop of blood on the towel was linked through DNA testing to Shane McInturff.

¶ 62 Appellant claims Perkins' testimony should not have been admitted because luminol testing is unreliable, and therefore Perkins' opinions lacked foundation. We disagree. We have held that luminol testing, as a scientific procedure, is sufficiently reliable for what it purports to do: presumptively indicate the possible presence of blood. *See Robedeaux v. State,* 1993 OK CR 57, ¶ 22, 866 P.2d 417, 425, *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). Appellant mistakenly equates a presumptive, *i.e.* inconclusive, scientific procedure with an unreliable, and therefore inadmissible, one. To be admissible, evidence need not be irrefutably conclusive of anything; it must only tend to make the existence of a particular fact of consequence more or less probable. 12 O.S.2001, § 2401. Regarding scientific or specialized knowledge, the relevant inquiry is whether the procedure used is reliable enough for its stated purpose, and whether the jury was misled as to the conclusions which could be drawn therefrom. *See* 12 O.S.2001, §§ 2403, 2702–05; *Romano v.*

*State,* 1995 OK CR 74, ¶ 25, 909 P.2d 92, 110, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996) (improper opinion regarding blood-spatter evidence); *McCarty v. State,* 1988 OK CR 271, ¶¶ 6–8, 765 P.2d 1215, 1218–19 (improper opinion regarding hair-comparison evidence).

¶ 63 Appellant's claims that the jury "no doubt" assumed that a luminol reaction conclusively indicated the presence of human blood, and that Perkins' testimony was "devastating" to the defense, are simply not supported by the record. Perkins made it explicitly clear that he could not say with certainty whether the areas which reacted to luminol actually contained the victims' blood, or any blood for that matter. He was cross-examined thoroughly on the limitations of luminol testing. Appellant's own expert also testified about luminol's strengths and weaknesses. *See Harris v. State,* 2000 OK CR 20, ¶¶ 27–28, 13 P.3d 489, 496–497, *cert. denied,* 532 U.S. 1025, 121 S.Ct. 1971, 149 L.Ed.2d 764 (2001). The luminol results were relevant, as they suggested that the perpetrator may have washed something covered with the victims' blood in the victims' bathroom sink. This inference could be corroborated by other undeniable facts: that the fatal injuries created a large amount of blood, that no weapon was left· at the scene, and that a hand towel, belonging to the victims and found in the apartment dumpster after the murders, was also stained with blood. An inference that the perpetrator may have cleaned himself and/or the murder weapon before leaving the scene was not difficult to reach, nor was it even arguably "devastating" to the defense, which focused on the claim that Appellant simply was not the perpetrator, and which emphasized that no traces of blood were found on Appellant, his effects, or the knife he had borrowed from Al Ames.

¶ 64 As for Perkins' and Bevel's opinions that the blood swipe on Sloniker's foot was "consistent" with Ames' hunting knife, and "could have" been made by that knife: there is no indication that these opinions were based on any particular specialized knowledge, and any comparison between the di-

mensions of the suspected murder weapon and the blood swipe was one the jurors could make without expert assistance. *See Wacoche v. State,* 1982 OK CR 55, ¶ 22, 644 P.2d 568, 573 (experts should not testify about matters which the jurors can determine for themselves). Yet, trial counsel did not lodge a contemporaneous objection to this testimony, thereby waiving all but plain error. *McCarty v. State,* 1998 OK CR 61, ¶ 60, 977 P.2d 1116, 1132. We fail to see how Appellant was prejudiced by this testimony. Both experts made it clear that they could not "match" any particular knife to the blood swipe, although they felt confident that the knives in Appellant's own collection were too narrow to have made the mark. Defense counsel chose to highlight that fact in cross-examination. The prosecutors' comments at various points during trial that Ames's knife matched the swipe (or words to that effect) were at times overstated, but the jury was instructed that these comments were not evidence; and as noted, the limitations of the evidence itself were apparent from the expert testimony. In fact, in final closing, the prosecutor invited the jurors to handle the physical evidence during deliberations and determine the issue for themselves.

¶ 65 Error occurs when the State offers scientific conclusions that cannot reasonably be drawn from the procedure used. No such error occurred here. The State's forensic experts' findings were relevant to the manner in which the victims were killed. The limitations of their methodologies, and the resulting qualifications on their conclusions, were thoroughly explored in cross-examination and through the presentation of defense expert testimony. The jury was not misled, either by testimony or argument, as to the inferences which could be drawn from this evidence. Proposition 4 is denied.

**7. Admission of gruesome crime-scene evidence**

¶ 66 At trial, the State offered into evidence the clothing worn by the victims at the time of their death, and several photographs of the victims at the crime scene. In Proposition 12, Appellant claims that this evidence was irrelevant, because the only

truly contested issue was the identity of the perpetrator. He also claims the evidence was unfairly prejudicial to him, because the grisly nature of the evidence was likely to evoke an emotional response from the jury. There is no error here. We have often noted that gruesome crimes make for gruesome crime-scene photographs; the issue is whether the probative value of the evidence is substantially outweighed by its prejudicial effect. 12 O.S.2001, §§ 2401–03; *Le v. State,* 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). The State was entitled to corroborate the testimony of its forensic experts about the nature of the wounds and the kinds of weapons that could have inflicted them, which was, in fact, a contested issue. *McGregor v. State,* 1994 OK CR 71, ¶ 18, 885 P.2d 1366, 1378–79 (photographs of victim), *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Smith v. State,* 1986 OK CR 158, ¶ 15, 727 P.2d 1366, 1370–71 (victim's blood-stained clothing), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987). The manner of death in this case was itself gruesome; evidence of the perpetrator's handiwork could hardly be otherwise. Any emotional response elicited by this evidence was a product of the perpetrator, not the State. This proposition is denied.

**E. GUILT–STAGE PROSECUTOR MIS-CONDUCT**

¶ 67 In Proposition 1, Appellant complains that the prosecutor used improper cross-examination techniques on him when he testified in the guilt stage of the trial. In Proposition 16(A), Appellant lists numerous instances of prosecutor conduct which, he claims, denied him a fair trial in the guilt stage.

¶ 68 Appellant first complains of several instances where the prosecutor attempted, over objection, to get him to admit certain elements the State was obligated to prove to obtain either a murder conviction or a death sentence. The trial court cut off some of these questions *sua sponte,* and sustained defense objections to others, such as whether Appellant believed the victims had been killed with malice aforethought, whether the

killer's acts posed a great risk of death to more than one person, whether the killer's conduct showed he posed a continuing threat to society, and whether the victims were killed to avoid lawful arrest or prosecution.

¶ 69 Because the trial court refused to permit Appellant to answer such questions, there was no error. *Torres v. State,* 1998 OK CR 40, ¶ 45, 962 P.2d 3, 17, *cert. denied,* 525 U.S. 1082, 119 S.Ct. 826, 142 L.Ed.2d 683 (1999). The only questions permitted by the trial court along these lines related to issues clearly not in dispute, such as the fact that two people had been killed, and that they had been killed unlawfully. Defense counsel did not object when the prosecutor asked Appellant if he had been previously convicted of a felony involving the use or threat of violence; Appellant's prior felony conviction was admissible to impeach his credibility as a witness. *See* 12 O.S.2001, § 2609.

¶ 70 Appellant also complains that the factual details surrounding his criminal history were improperly admitted during the guilt stage. While a witness's prior convictions for felony offenses, or any crime involving dishonesty, are generally admissible to impeach his credibility as a witness, the nature and details of the prior offense may not be relevant, and may be unduly prejudicial if the witness is the accused. *See id.; Robinson v. State,* 1987 OK CR 195, ¶ 7, 743 P.2d 1088, 1090–91. However, specific instances of the witness's conduct (whether or not they resulted in a criminal conviction) are admissible on cross-examination if they bear on his "character for truthfulness." 12 O.S.2001, § 2608(B)(1).

¶ 71 The details of Appellant's criminal history were directly relevant to his credibility as a witness. When Appellant was first questioned in this case, police were aware of his criminal record. During the interview, Appellant made false statements in an attempt to diminish his role in a prior robbery. During direct examination at trial, Appellant explained that he lied to police about several things, such as the purpose of writing the two checks to McInturff, because he did not

want police to learn that he was using illegal drugs, particularly since he was a convicted felon.

¶ 72 When reaching the subject of Appellant's prior felony and the details Appellant gave police about it, defense counsel approached the bench and informed the trial court that if, pursuant to the trial court's ruling *in limine,* the details of that offense were going to be admissible for impeachment purposes, she would rather them be revealed on direct examination. We find that under these circumstances, (1) the trial court's ruling *in limine* was proper, as the particulars of the prior offense were admissible under § 2608(B)(1) of the Evidence Code to impeach Appellant's credibility; (2) defense counsel waived any error by choosing to broach the subject on direct examination, thereby avoiding the "sting" of having them first revealed by the prosecutor on cross-examination, *see Jones v. State,* 1976 OK CR 207, ¶ 21, 554 P.2d 830, 834–35;[5] and (3) because Appellant's criminal record was essential to his explanation, on the witness stand, of why he lied to police during questioning, defense counsel's considered strategy in opening the door to this line of inquiry was professionally reasonable, *see Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

¶ 73 Appellant also opened the door to cross-examination about specific instances of prior criminal conduct which may not have resulted in a conviction, and not all of which involved dishonesty when they were committed. Again, Appellant did this on direct examination, by volunteering information about his conduct while on probation for the prior robbery, implying that he had his probation revoked for minor, technical, or unfair reasons. When pressed on cross-examination, Appellant admitted that his probation had been revoked in large part due to the fact that he committed larceny, and that he attempted to escape the custody of his probation officer by pushing her away and crashing through the probation office window. A witness who offers one-sided versions of his

5. *See also Ohler v. United States,* 529 U.S. 753, 760, 120 S.Ct. 1851, 1855, 146 L.Ed.2d 826 (2000) (defendant who preemptively introduces evidence of prior conviction on direct examination may not claim on appeal that admission of such evidence was error).

own past conduct subjects himself to cross-examination aimed at showing the jury that he is not telling the whole truth about that conduct, and therefore, cannot be trusted to tell the truth about other matters either. The details surrounding Appellant's prior felony conviction and probation revocation were admissible on cross-examination because they were relevant to his credibility as a witness. 12 O.S.2001, § 2608(B)(1); *Hawkins v. State*, 1986 OK CR 58, ¶¶ 7–8, 717 P.2d 1156, 1158–59.

¶ 74 Also during cross-examination, the prosecutor asked Appellant why his wife had never been offered as a witness to corroborate his sudden claim that Al Ames's knife had been in her car all weekend. There was nothing improper about this question. Where the evidence indicates that another witness has information to corroborate the defendant's account, it is not improper for the prosecutor to comment on the failure of the defense to present that witness. *Jackson v. State*, 1988 OK CR 236, ¶ 5, 763 P.2d 388, 389.

¶ 75 Appellant claims the prosecutor deliberately tricked him into referring to the fact that he had previously been sentenced to death in this case, and to the fact that he had previously taken a polygraph examination. We find both subjects were brought up by Appellant himself, not the prosecutor. The prosecutor inquired about Internet sites describing Appellant's case and whether Appellant had approved them. He did this to impeach Appellant's credibility, because much of the information about the case on one particular site was simply inaccurate and slanted in Appellant's favor. It was Appellant, not the prosecutor, who described a second organization with Internet information about his case as one for "all prisoners on death row." Defense counsel did not object or ask that the jury be admonished to disregard this answer. Similarly, Appellant's several references to having taken a poly-

graph test were not responsive to the prosecutor's questions and were not met with any objection by defense counsel.[6] The results of that test were never disclosed. The jury was specifically instructed that any references to polygraph tests were not for it to consider. Any error was either waived or cured. *Sheppard v. State*, 1983 OK CR 143, ¶ 3, 670 P.2d 604, 605–06.

¶ 76 Appellant lists several other instances of guilt-stage prosecutor commentary which he contends were improper. Most were not met with a timely objection, and we find no reversible error in any of them. There was nothing improper about the prosecutor stating, in *voir dire*, that the State would specifically ask for the death penalty in this case, and Appellant cites no relevant authority holding otherwise. Although Appellant complains that the prosecutor made comments referring to Appellant's prior trial and death sentence, we note, from the record of *voir dire*, that many jurors had some vague information about the procedural history of this case. Jurors are not required to be totally ignorant of the case they are empaneled to try. Both counsel and the court took great pains throughout this trial to avoid, as much as possible, any references to "the first trial." We find no evidence that the prosecutor deliberately interjected any information some jurors might not have already known, or that he sought to diminish the jurors' sense of responsibility for determining guilt or innocence and, if necessary, appropriate punishment. *Romano*, 1995 OK CR 74, ¶¶ 49–52, 909 P.2d at 114–15; *Brecheen v. State*, 1992 OK CR 42, ¶ 11, 835 P.2d 117, 120, *cert. denied*, 506 U.S. 1085, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993).

¶ 77 The prosecutor's comment, during opening statement and without objection, that the blood swipe on Sloniker's foot was a "perfect match" with Ames's knife was clarified by considerable forensic expert tes-

6. Appellant claims trial counsel rendered ineffective assistance and violated the attorney-client privilege by telling the trial court, out of the hearing of the jury, that she had advised Appellant that the results of any polygraph examination were inadmissible at trial. This argument is meritless. Appellant personally waived any con-

fidentiality concerns by volunteering, in front of the jury, the fact that he interjected the subject of polygraph tests against the advice of counsel. *See* 12 O.S.2001, § 2502. Appellant fails to demonstrate how he was prejudiced by counsel's statement to the court.

timony on the subject. *See* discussion of Proposition 4. A single comment made without objection about the incriminating force of the homicide magazines found in Appellant's apartment, reiteration of the medical examiner's testimony that these knife wounds were some of the worst he had ever seen, implying that Appellant secretly unlocked the victims' living room window when the bodies were first discovered inside the locked apartment (to make it look like the perpetrator entered without permission), that such evidence required Appellant to "come up with a story," and closing-argument assertions that Appellant was a "brutal amateur" at killing were not improper, but were fair comments and reasonable inferences based on the evidence presented. *Harris v. State*, 2000 OK CR 20, ¶ 38, 13 P.3d at 500. Eliciting testimony that Appellant had, months before the murders, feigned illness to obtain pain medication was invited by defense counsel's prior cross-examination and was not met with a timely objection. *Mayes v. State*, 1994 OK CR 44, ¶ 88, 887 P.2d 1288, 1311, *cert. denied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

¶ 78 Appellant also makes several complaints characterizing the lead prosecutor's conduct as melodramatic in general, and in particular, sarcastic about Appellant's emotional demeanor during his testimony. While cross-examining Appellant, the prosecutor made a comment couched as a question when he asked, "This is hard when you're having to do it on the fly, isn't it?" This type of question, asked without any real expectation of an answer and only for the purpose of attacking the witness's credibility, is gratuitous and improper. However, it is not improper for a prosecutor to comment on reasonable inferences based on the defendant's demeanor, when the defendant offers himself as a witness. *Mitchell v. State*, 1994 OK CR 70, ¶ 46, 884 P.2d 1186, 1203, *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). The prosecutor's conduct was at times melodramatic, and his sidebar comments about the defendant's demeanor would have been better reserved for closing argument. The trial in this case was long and sometimes emotional. Counsel for both parties were experienced, prepared, and zealous advocates. That zeal may have overtaken them briefly at times. Appellant concedes in his brief that neither side was beyond reproach. We have considered the instances Appellant complains of carefully, in light of the entire record, and cannot say that this conduct, alone or in accumulation, affected the outcome of the trial. This proposition is denied.

## F. SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTION

¶ 79 In Proposition 9, Appellant contends that the evidence presented at trial was insufficient to support his convictions. Appellant argues that because the State's case consisted largely of circumstantial evidence, a more stringent sufficiency-of-the-evidence test should apply on direct review. We disagree.

¶ 80 The law makes no distinction between direct and circumstantial evidence; either, or any combination of the two, may be sufficient to support a conviction. *Clark v. State*, 1983 OK CR 79, ¶ 8, 664 P.2d 1065, 1066; OUJI–CR (2nd) No. 9–4. Rarely, if ever, is the State's case against a criminal defendant entirely direct or entirely circumstantial. Regardless of the nature of the evidence, there is but one standard by which each element of the offense must be proven to obtain a conviction, and that is by proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Flores v. State*, 1995 OK CR 9, ¶ 15, 896 P.2d 558, 563, *cert. denied,* 516 U.S. 1002, 116 S.Ct. 548, 133 L.Ed.2d 450 (1995); *D.R.R. v. State*, 1987 OK CR 40, ¶ 3, 734 P.2d 310, 311. Just as the jury is instructed to give equal attention to direct and circumstantial evidence, our task on direct review is the same regardless of the nature of the evidence. We must resolve any factual issues, including the ultimate question of sufficiency of the evidence, with deference to the fact finder and in a light most favorable to the prevailing party below. If circumstantial evidence lends itself to alternative inferences, we must, on appeal, consider the inferences which most logically and forcefully support the jury's verdict. *See Woodruff v.*

*State,* 1993 OK CR 7, ¶ 19, 846 P.2d 1124, 1133, *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); *Hightower v. State,* 1983 OK CR 162, ¶ 8, 672 P.2d 671, 675.

¶ 81 The jury in this case was presented with an interconnected web of physical evidence, eyewitness testimony, and inconsistent statements of the accused. The State presented testimony that Appellant was one of the last people to have seen the victims alive, and that he was involved in an altercation with them at that time; that he had both motive and opportunity to commit the crimes; that he had a collection of weaponry, particularly knives, an interest in methods of killing, and access to one knife in particular that was consistent with the attributes of whatever weapon was used—a knife which Appellant just happened to return to its owner the day after the murders.

¶ 82 A pair of wet blue jeans was found in Appellant's apartment a day or so after the murders. When he testified, Appellant had no explanation for why the jeans were wet. Appellant's wife had been out of town the weekend of the murders, and she testified that she did not wash them. Moreover, it would have been unlikely that the jeans would have remained wet from the Friday that she left until the Monday evening when they were seized.

¶ 83 Many of Appellant's original statements to police were made before he realized that physical and eyewitness evidence would work together to contradict him. Appellant then changed his version of events to try to accommodate these new facts, such as why he had written checks to McInturff, when and how he got the checks back, and what he did to dispose of them.

¶ 84 When Appellant testified at trial, he offered entirely new explanations for some very damaging pieces of circumstantial evidence, such as his advance knowledge of how the victims were murdered, and his access to Al Ames's hunting knife. These new expla-nations were themselves impeached by testimony presented in the State's rebuttal.

¶ 85 In evaluating this kind of evidence, we are guided by this Court's observations about circumstantial evidence in *Ex parte Jefferies,* 7 Okl.Cr. 544, 548, 124 P. 924 (1912):

> A single fact standing by itself may be of no value as evidence; two or three or more facts or circumstances taken together might not be sufficient to justify a conviction; but where a multitude of facts or circumstances, some of which may be slight, are taken together and proven to be true, they may irresistibly compel the jury to return a verdict of guilt in a case of the most serious moment. In cases depending upon direct testimony, where but few facts are involved, it is a very easy matter to fabricate the evidence in such a manner as to make detection almost impossible. Herein lies the greatest danger in cases depending upon direct evidence. In cases depending upon circumstantial evidence, witnesses may swear falsely as to the circumstances relied upon; but experience shows that it is impossible to fabricate consistency in the circumstances themselves, where many facts are involved. *Jefferies,* 7 Okl.Cr. at 548, 124 P. at 925–26.

¶ 86 While each piece of evidence presented to the jury might, when viewed in isolation, have permitted inferences which are consistent with Appellant's innocence, we must, like the jury, consider all of the evidence together. This Court has often held that when the evidence against the accused is circumstantial in nature, the evidence should exclude every reasonable theory of the defendant's innocence.[7] *See e.g. Riley v. State,* 1988 OK CR 144, ¶ 6, 760 P.2d 198, 199. Appellant claims that the evidence at his trial failed to meet this test, yet nowhere does he attempt to specify what alternative hypotheses existed, much less why they create a reasonable doubt as to his guilt. The jury was instructed to give particularly careful consideration to circumstantial evidence. Reviewing the evidence as a whole, including

---

7. Recently, this Court amended the Uniform Jury Instruction regarding circumstantial evidence to make it clear that such evidence does not place a higher burden of proof on the State. *Easlick v. State,* 2004 OK CR 21, 90 P.3d 556.

evidence presented by the defense, we believe a rational juror could have determined that Appellant's guilt was the only reasonable hypothesis presented, and further, that that hypothesis was proven beyond a reasonable doubt. *Smith v. State,* 1985 OK CR 15, ¶ 7, 695 P.2d 1360, 1362. This proposition is denied.

## G. ISSUES RELATING TO PUNISHMENT

### 1. Punishment-stage prosecutor misconduct

¶ 87 In the latter part of Proposition 1, and in Proposition 16(B), Appellant lists numerous instances of prosecutor conduct which, he claims, denied him a fair trial in the punishment stage. We first address the prosecutor's cross-examination of Appellant's grandmother, Mary Dodd, who was presented as a mitigation witness. Mrs. Dodd testified generally about why Appellant was a good person who did not deserve the death penalty. Among other things, Mrs. Dodd said she could not recall Appellant being anything but a "sweet, sweet child." The prosecutor challenged Mrs. Dodd's opinion by asking her if she was aware that at age fourteen, Appellant had robbed a paperboy at knifepoint. Appellant claims this question was improper for several reasons, and suggests that trial defense counsel rendered deficient performance by not successfully avoiding it.

¶ 88 When the defendant calls witnesses to give opinions about his good character, the State may, in cross-examination, explore the basis for those opinions by inquiring into specific instances of the defendant's bad character, whether the character witness is aware of them, and if not, whether the witness's opinion is altered by the revelation. The type of inquiry permissible on cross-examination depends on the type of character evidence offered by the defense. *See* 12 O.S.2001, § 2401(A)(1), 2405(A).

■■■ ¶ 89 Appellant complains that the evidence was inadmissible because it related to a juvenile offense. Unlike convictions for felony crimes and crimes of dishonesty, evidence of juvenile adjudications is generally not admissible to impeach a witness's credibility. 12 O.S.2001, § 2609(D). But here, the prosecutor was not presenting evidence of a juvenile adjudication to show that Appellant was not a credible witness; rather, he was inquiring into the underlying bad conduct itself to test another witness's opinion as to Appellant's character—a purpose which is not within the scope of § 2609. *See Douglas,* 1997 OK CR 79, ¶ 35, 951 P.2d at 665.

■■■ ¶ 90 We find that Mrs. Dodd's opinion, as to Appellant's general good character as a child, entitled the prosecutor to ask her whether that opinion was formed with knowledge of a specific instance evincing Appellant's character for violence. *Parker v. State,* 1996 OK CR 19, ¶¶ 34–36, 917 P.2d 980, 987–88, *cert. denied,* 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997). The conduct in question was not otherwise inadmissible in a capital sentencing proceeding. *See Medlock v. State,* 1994 OK CR 65, ¶ 41, 887 P.2d 1333, 1346 (defendant's violent conduct as a juvenile is admissible as substantive evidence that he posed a continuing threat to society), *cert. denied,* 516 U.S. 918, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995). Because the jury did not find Appellant to be a "continuing threat to society" in the punishment stage, and the evidence in question was not germane to any other aggravator, Appellant cannot demonstrate any prejudice. *McGregor v. State,* 1994 OK CR 71, ¶ 33, 885 P.2d 1366, 1382–83. As there was no prejudice, we find any prosecutor commentary on this subject in closing argument harmless beyond a reasonable doubt. Besides the lack of prejudice, we find defense counsel's tactical decision to call Appellant's grandmother as a mitigation witness was a reasonable gambit; family members testifying as to a defendant's good character are often essential mitigation evidence, and it was unlikely that evidence of Appellant's bad conduct as a juvenile could have been avoided, particularly as Appellant's mother was also called to testify in mitigation and personally recalled the incident. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

■■■ ¶ 91 Appellant lists several other instances of prosecutor inquiry and commentary that he contends were improper. In closing argument, the prosecutor told the

jury that Appellant had admitted three of the aggravating circumstances alleged in support of the death penalty. We discussed the actual questions put to Appellant in our discussion of first-stage prosecutor misconduct. Defense counsel did not object to these comments, and we find no prejudice; the jury rejected one of the aggravators that the prosecutor claimed was conceded, and the only two aggravators found by the jury were overwhelmingly established by the evidence. *Pickens v. State,* 1996 OK CR 6, ¶ 13, 910 P.2d 1063, 1068.

¶ 92 As for the prosecutor's speculation that Lisa Way might have been a third victim had she decided to stay the night, his comment on the confrontational demeanor of Appellant's former cellmate as a witness, his references to the crime-scene photographs, and his implication of Appellant in the burglary of the victims' apartment, these were all reasonable inferences from the guilt-stage evidence, and were not objected to by the defense. *Black v. State,* 2001 OK CR 5, ¶ 54, 21 P.3d 1047, 1068, cert. denied, 534 U.S. 1004, 122 S.Ct. 483, 151 L.Ed.2d 396.

¶ 93 The prosecutor's brief comment on Appellant's lack of remorse was improper, as Appellant maintained his innocence throughout trial; defense counsel's objection was quickly sustained and the prosecutor said no more about the subject. Any error was cured. *Walker v. State,* 1989 OK CR 64, ¶ 13, 781 P.2d 838, 841. The prosecutor's claims that death was the only appropriate sentence were not met with an objection, and we find nothing improper about them. Throughout closing, the prosecutor pointed to evidence to support his claim that a death sentence was the only "reasoned moral response," echoing language used by the Supreme Court. *See Payne,* 501 U.S. at 836, 111 S.Ct. at 2614 (citations omitted). Similarly, the prosecutor's discussion of how mitigating evidence should be evaluated was a fair characterization of the law. *Slaughter,* 1997 OK CR 78, ¶¶ 79–80, 950 P.2d at 861 (plurality opinion). There was no error here.

## 2. Victim impact evidence

¶ 94 In Proposition 13, Appellant raises several objections to the victim impact testimony presented in the punishment stage of trial. Before the State's seven victim-impact witnesses actually took the stand, the trial court spent considerable time with counsel reviewing the proposed testimony of each. The concerns expressed by the defense and/or the court prompted several editorial revisions to the prepared victim impact statements.

¶ 95 In the sentencing phase of a capital trial, the State may present evidence "about the victim and about the impact of the murder on the family of the victim." 21 O.S. 2001, § 701.10(C). Members of the victim's "immediate family," as that term is defined by statute, may offer evidence about the financial, emotional, psychological, and physical effects of the crime; these immediate family members may also designate a person to speak on their behalf. This "victim impact evidence" may include information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and a recommendation as to the appropriate sentence. *See generally* 22 O.S.2001, §§ 984, 984.1. The general admissibility of victim impact evidence in a capital sentencing proceeding was approved of by the United States Supreme Court in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720, 735 (1991). In *Cargle v. State,* 1995 OK CR 77, ¶¶ 74–78, 909 P.2d 806, 827–29, cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), we established guidelines to assist trial courts in evaluating the propriety of victim impact evidence in accordance with the relevant statutes as well as constitutional concerns.

¶ 96 As an initial matter, Appellant complains that the trial court did not find the existence of an aggravating circumstance before permitting victim impact testimony. *Cargle* does not require the trial court to weigh the sufficiency of the evidence regarding aggravating circumstances, only that there be some evidence "already present in the record" to support an aggravating circumstance. *Cargle,* 1995 OK CR 77 at ¶ 76, 909 P.2d at 828. Appellant failed to request an express judicial finding to this effect. One of the aggravators the jury ultimately found, *i.e.* the great risk of death to

more than one person, was overwhelmingly proven by the first-stage evidence (*see* discussion of Proposition 14), and that evidence was incorporated at the beginning of the punishment stage. Testimony supporting the "prior violent felony" aggravator (also found by the jury) was also presented before the victim impact witnesses took the stand. The trial court's failure to make specific findings was therefore harmless beyond a reasonable doubt. *Miller v. State*, 2001 OK CR 17, ¶ 37, 29 P.3d 1077, 1085.

¶ 97 Five witnesses offered victim impact evidence on Shane McInturff's behalf: his mother, father, brother, sister, and an aunt appearing as a designated family representative. Victim impact witnesses on behalf of Keri Sloniker included her mother and sister. Appellant complains that as a designated family representative, Donna Sanford, Shane's aunt, should have testified in lieu of, not in addition to, any other immediate family members. He also complains that Sanford should not have been allowed to mention how Shane's death affected her personally, as she was appearing in the role of family representative and was not herself eligible to testify as "immediate family" under § 984. Appellant contends that the testimony of Debi Nelson, Keri Sloniker's mother, recounting the history of Shane and Keri's relationship was needlessly cumulative. He contends that a comment by Anne McInturff, Shane's mother, to the effect that Shane would have given his life for Keri had he believed their lives were in jeopardy, was speculative and too emotional. Appellant also complains generally that on various occasions, the victim impact testimony "improperly focused" on speculation about Shane and Keri's future, on Shane's "irrelevant" childhood, and on how those other than "immediate" family members had been affected by Shane and Keri's deaths.

¶ 98 It is a violation of § 984 for a victim impact witness to testify to the effect of the victim's death on someone other than one of the family members specified by statute. *See Hanson v. State*, 2003 OK CR 12, ¶¶ 27–28, 72 P.3d 40, 54–55 (error for victim's niece, testifying as family representative, to testify to impact on extended family, including herself, and for victim's sister to testify about impact on her own son). We have also expressed concern about the relevance of testimony that focuses on memories of the victim's childhood or plans the victim had for the future. *See Brown v. State*, 1998 OK CR 77, ¶ 84, 989 P.2d 913, 933 (statements about the victim's childhood); *Phillips v. State*, 1999 OK CR 38, ¶ 100, 989 P.2d 1017, 1043 (statements about the victim's future plans), *cert. denied*, 531 U.S. 837, 121 S.Ct. 97, 148 L.Ed.2d 56 (2000). We recognize, however, that human relationships cannot be nicely compartmentalized. While victim impact evidence looks to the loss inflicted upon members of the victim's "immediate family," that loss rarely occurs in a vacuum, apart from the experiences of other family members. Similarly, the pain of loss necessarily depends on the combination of two things: the past experiences that the survivor remembers having with the lost loved one, and the new experiences that the survivor has, by virtue of the loss, forever been denied. The first concerns the value of the life taken; the second concerns the pain inflicted on the lives left behind. Both demonstrate the "specific harm caused by the defendant," *see Payne*, 501 U.S. at 825, 111 S.Ct. at 2608, and are admissible under our statutes to the extent that they show the financial, emotional, psychological, and physical effects of the murder. 22 O.S.2001, § 984(1).

¶ 99 Our legislature has placed no limits on the number of otherwise eligible family members who may testify as victim impact witnesses.[8] 22 O.S.2001, § 984.1(A). It is true that, in a case involving a deceased crime victim, the language of § 984.1 appears to permit any number of eligible members of the victim's family to testify, or a single representative designated by the family to

---

8. Appellant points out that the victim impact testimony (including preliminary questions and other formalities of the record) comprises some twenty-six pages of transcript. We find the number of victim impact witnesses—which is, of course, directly affected by the number of murder victims—to be just as relevant as the number of pages of transcript. Viewed individually, the statement of each of the seven victim impact witnesses was relatively concise; none comprised over five pages of transcript, and several comprised two pages or less.

testify, but not both. *See Lott v. State,* 2004 OK CR 27, ¶ 109, 98 P.3d 318, 346. Testifying as a designated family representative, Donna Sanford offered a third-person perspective on how Shane McInturff's death affected his family, particularly his parents. Given that Shane McInturff's parents also testified on their own behalf as victim impact witnesses, permitting Sanford to testify was not in compliance with § 984.1. However, Sanford's testimony was brief and did not focus on the emotional aspects of Shane's death. Similarly, because she was not part of the statutorily-defined "immediate family," Sanford's references to the impact of Shane's death on herself were not in strict compliance with § 984. While it was error for the trial court to allow such testimony, considering Sanford's statement in its entirety, and the fact that it was largely cumulative to other proper testimony, we cannot say it "improperly weighted the scales" against Appellant, or that it improperly influenced the outcome of the trial.[9] *Payne,* 501 U.S. at 822, 111 S.Ct. at 2606–07; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ ¶ 100 Similarly, Debi Nelson's recollection of how Shane and Keri met, and fell in love, was an extremely concise part of an otherwise brief statement. As a fundamental part of her reflection on Keri's life, it was not "needlessly" cumulative to guilt-stage evidence, and we find no unfair prejudice in it. Anne McInturff's belief that her son would have tried to save Keri's life was clearly based on her personal assessment of Shane's character, and we cannot say it was too emotional or otherwise improper.[10] While the victim impact statements can be parsed for occasional references to persons other than immediate family, we reject Appellant's claim that they improperly focused on those persons. Occasional references to Shane's childhood gave a "brief glimpse" into the formation of his character, which in turn provided a basis for witnesses' personal knowledge of and relationship with him; like the brief references to Shane and Keri's plans for the future, they were relevant to the emotional and psychological loss caused by the crimes.[11] *Welch,* 2000 OK CR 8, ¶ 41, 2 P.3d at 373.

¶ 101 Finally, Appellant complains that the victim impact witnesses should not have been allowed to recommend the death penalty as an appropriate punishment. Section 984(1) specifically permits such recommendations, and we have cautioned that they should be limited to "a straight-forward, concise response to a question asking what the recommendation is" or "a short statement of recommendation in a written statement, without amplification." *Welch,* 2000 OK CR 8, ¶ 46, 2 P.3d at 374. *Compare Willingham v. State,* 1997 OK CR 62, ¶ 74, 947 P.2d 1074, 1088 (allowing murder victim's son to describe the conditions under which he believed the defendant should be put to death was error, albeit harmless). Those admonitions were observed here. We decline to reconsider our position.

■ ¶ 102 Even assuming there is any question as to the propriety of the victim impact evidence, to determine unfair prejudice, we look to the strength of the State's case in aggravation and whether the trial court properly instructed the jury on the use of victim impact evidence. *Welch,* 2000 OK

9. Appellant claims the sheer number of other family members who testified aggravated this perceived error. Appellant refers to six other immediate family members who testified. In fact, two of those witnesses testified as Keri Sloniker's victim impact witnesses.

10. Mrs. McInturff's comment was prefaced by her admission that she did not know what happened on the night of the murders and did not want to know; it was immediately followed by her observation that Shane was "always so protective of everyone he loved."

11. The statements offered in this case came nowhere near the graphic and unduly emotional comments that have caused us some concern in the past. *Compare Hain v. State,* 1996 OK CR 26, ¶¶ 49–53, 919 P.2d 1130, 1144 (allowing murder victim's mother to state she wished her son could have died a gentle death, such as the family dog had experienced when euthanized, was error, though harmless), *cert. denied,* 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996); *Hooper v. State,* 1997 OK CR 64, ¶ 37, 947 P.2d 1090, 1105 (allowing victim impact witness to speculate that the defendant looked into the victim's "big, beautiful brown eyes" before killing her was error, albeit harmless).

CR 8, ¶ 42, 2 P.3d at 373. As we have already observed, the aggravating circumstances found by the jury were established overwhelmingly in the guilt phase of trial—one by the nature of the double murder itself, the other by Appellant's admission to a past crime of violence. The jury clearly paid close attention to the law as it applied to the facts, because it rejected two other aggravating circumstances alleged by the State. Appellant does not claim, and we do not find, any impropriety in the trial court's victim impact instructions. We also note that from the circumstances surrounding the crime itself, presented in the guilt phase and incorporated into the punishment phase, the jury was well aware of the victims' involvement with illegal drugs. The jury was thus presented with a well-balanced sketch of the victims' lives. We cannot say the victim impact evidence distracted the jury from rendering punishment out of a "reasoned, moral response" to the crimes. *Williams v. State,* 2001 OK CR 9, ¶ 62, 22 P.3d 702, 719, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). Therefore, any minor impropriety in the victim impact testimony was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This proposition is denied.

### 3. Sufficiency of evidence on aggravating circumstances

¶ 103 In Proposition 14, Appellant complains of errors relating to the aggravating circumstances found by the jury to support the death penalty. The jury found only two of the four aggravating circumstances alleged by the State: (1) that Appellant had previously been convicted of a felony offense involving the use or threat of violence, and (2) that Appellant's conduct posed a great risk of death to more than one person. The first aggravating circumstance was established by proof, including Appellant's own admissions, that at the age of sixteen he participated in a robbery wherein he beat an elderly woman on the head with a fireplace log. The second aggravating circumstance was established by the fact that in this case, two people were murdered at the same time and place.

### a. "Prior violent felony" aggravating circumstance

¶ 104 Appellant contends that offenses committed while he was a juvenile should not be admissible to support the prior-violent-felony aggravator. However, as the State points out, Appellant was not a "juvenile" when he committed the armed robbery at sixteen years of age. Given the seriousness of the offense, Appellant was, under Oklahoma law, charged and convicted as an adult, and he cannot avail himself of any public policy arguments against admission of juvenile adjudications. While Appellant states that offenses committed when one is a juvenile "do not necessarily accurately predict one's actions as an adult," the jury in this case did not use Appellant's conduct as a sixteen-year-old to predict his future actions, as it did not find Appellant to be a "continuing threat to society." Rather, the jury only considered the conduct as evidence of a particular historical fact—prior conviction for a violent felony offense—which, by law, renders one eligible for the death penalty. *See Williams,* 2001 OK CR 9, ¶ 100, 22 P.3d at 725 (noting different purposes between "continuing threat" and "prior violent felony" aggravators).

¶ 105 Nor do we find any prejudice in the admission of testimony and photographs concerning the injuries sustained by the victim in the prior robbery offense. They shed more light on the circumstances of the offense much more than mere documentary evidence of a conviction. Specifically, they tended to show that the offense was not just potentially violent, but indisputably so. The State was entitled to present evidence beyond the Judgment and Sentence to establish the violent nature of the prior offense. *Brewer v. State,* 1982 OK CR 128, ¶¶ 35-43, 650 P.2d 54, 62, *cert. denied,* 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983).

### b. "Great risk of death to more than one person" aggravating circumstance

¶ 106 Appellant also challenges the evidence supporting the "great risk of death to more than one person" aggravating cir-

cumstance. Noting that in all likelihood, the perpetrator could only have cut the throat of one victim at a time, Appellant claims that there was no "great risk of death" to either victim while the other victim's throat was being cut. We cannot seriously entertain this assertion. The evidence showed that the victims were killed in the same manner, at the same place, and at essentially the same time, presenting a classic example of the "great risk of death" aggravating circumstance. *See McElmurry v. State,* 2002 OK CR 40, ¶ 106, 60 P.3d 4, 28, and numerous cases cited therein.

¶ 107 Appellant's arguments concerning the constitutionality of this aggravating circumstance are likewise unavailing. He claims the State was collaterally estopped from using evidence of either victim's murder to support the "great risk of death" aggravating circumstance relative to the other. This argument is meritless. The fact that Appellant had been found guilty of each murder in the guilt stage of the trial did not, under the doctrine of collateral estoppel, prevent the jury from considering the cumulative effect of this same evidence again in the punishment stage of the trial. We have rejected similar claims in the past. *Bowie v. State,* 1995 OK CR 4, ¶ 18, 906 P.2d 759, 762; *Romano,* 1993 OK CR 8, ¶¶ 83–88, 847 P.2d at 387–88. We reject this one as well.

¶ 108 Appellant also complains that the "great risk of death" aggravating circumstance is invalid because it does not effectively narrow the field of intentional murders eligible for the death penalty. Appellant claims this aggravating circumstance results in "automatic death eligibility" whenever more than one person is murdered at the same time and place. So it does. The fault in Appellant's argument, of course, is that he is comparing one subclass of intentional murders with itself. The real issue is whether the aggravating circumstance results in "automatic" death-sentence eligibility in *every* first-degree murder case. Obviously, not all intentional murders are committed in circumstances which pose a great risk of death to more than one person. This aggravating circumstance narrows death-sentence eligibility to particular conditions not inherent in every case, which is all it is constitutionally required to do. *See Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994); *McElmurry,* 2002 OK CR 40, ¶ 104, 60 P.3d at 27. This proposition is denied.

### c. Constitutionality of the death penalty as applied in this case

¶ 109 In Proposition 15, Appellant contends that imposition of the death penalty violates his constitutional protection from cruel or unusual punishment [12] when it is imposed in cases where the defendant's guilt is based "solely" on circumstantial evidence. We have already considered the sufficiency of the evidence to support Appellant's convictions in our discussion of Proposition 9. For reasons enunciated therein, it makes no sense to treat circumstantial evidence as necessarily inferior to direct evidence. For the same reasons, it makes no sense to treat a death sentence as illegitimate or inherently suspect when it rests on more of one kind of evidence than the other. Circumstantial evidence can be infinitely more trustworthy than the "direct" observations of a single purported "eyewitness," who may have a motive to lie, or who may simply be mistaken in his or her observations. Regardless of the nature of the evidence supporting a defendant's conviction, a sentence of death may only be imposed after the most rigorous procedures known to our system of justice. Appellant offers no authority directly supporting his position, and we are aware of none. This proposition is denied.

### 4. Miscellaneous issues

¶ 110 In Proposition 21, Appellant catalogues a number of issues which, he concedes, this Court has previously rejected. *See Patton,* 1998 OK CR 66, ¶ 103, 973 P.2d at 298; *see also Walker v. State,* 1997 OK CR 3, ¶ 5, 933 P.2d 327, 331 (urging appellate counsel to raise any arguably meritorious claims on direct appeal to avoid forfeiture in

---

12. *See* U.S. Const. Amend. VIII (banning "cruel and unusual" punishments); Okla. Const. art. II, §§ 7, 20 (banning "cruel or unusual" punishments).

subsequent proceedings), *cert. denied,* 521 U.S. 1125, 117 S.Ct. 2524, 138 L.Ed.2d 1024 (1997). Most of these issues are unique to capital prosecutions. Appellant provides citations to the appeal record where the issues were raised below, citations to case law where we have previously ruled on them, and requests that we reconsider each one. Appellant offers no convincing reasons why we should reverse our positions on these issues, and we thus decline to do so.[13]

## H. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 111 In Proposition 18, Appellant advances a claim that his trial attorneys rendered constitutionally deficient performance which denied him a fair trial. He references several ineffective-counsel claims made elsewhere in his brief, and specifies several more. Because we have found no deficient performance or prejudice in the preceding claims, we focus here on the new claims and on a cumulative assessment of trial counsel's performance.

¶ 112 To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance by showing: (1) that trial counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. *Black v. State,* 2001 OK CR 5, ¶ 65, 21 P.3d 1047, 1070, *cert. denied,* 534 U.S. 1004, 122 S.Ct. 483, 151 L.Ed.2d 396 (2001); *see also Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674 (1984). Failure to prove either of the elements is fatal to an ineffective-counsel claim. *Id.*

¶ 113 First, Appellant claims that counsel was ineffective for permitting Detective Yardley to testify to a hearsay description of clothing Appellant was wearing in the early hours of Sunday, November 6. We find this testimony harmless, because an eyewitness (Dennis Kersh) testified to seeing Appellant outside the victims' apartment at that time, and Appellant admitted as much in his own testimony. Second, Appellant faults counsel for permitting Detective Yardley to speculate that Appellant could have unlocked a window in the victims' apartment while Robert McInturff was not looking. Because this conclusion was based on Yardley's personal observations at the crime scene and was corroborated by Mr. McInturff's own testimony, it was not improper; therefore, Appellant was not prejudiced by counsel's failure to object. Third, Appellant claims counsel was ineffective for opening the door to cross-examination regarding the details of Appel-

13. (1) The Oklahoma Uniform Jury Instructions–Criminal (OUJI–CR) adequately state the law on how the jury should evaluate aggravating and mitigating circumstances in a capital sentencing proceeding. *Johnson v. State,* 1996 OK CR 36, ¶¶ 31–33, 928 P.2d 309, 317, *cert. denied,* 522 U.S. 832, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997). (2) The trial court did not err in barring *voir dire* and evidence on the mechanics of Oklahoma's parole system. *Williams v. State,* 2001 OK CR 24, ¶ 6, 31 P.3d 1046, 1049, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002); *Johnson,* 1996 OK CR 36, ¶ 51, 928 P.2d at 320. (3) The death penalty was not unconstitutional as implemented this case. *Harris v. State,* 2004 OK CR 1, ¶ 52, 84 P.3d 731, 751. (4) Oklahoma's capital sentencing procedure is not invalid by requiring the jury to make special findings of fact. *Patton,* 1998 OK CR 66, ¶ 103, 973 P.2d at 298. (5) The trial court did not err in overruling defense motions to present evidence or argument on the cost-effectiveness and deterrent effect of the death penalty. *Harris,* 2004 OK CR 1, ¶ 52, 84 P.3d at 751. (6) The trial court did not err in declining to instruct the jury to presume that any sentence it imposed would be carried out. *Id.*

(7) The trial court did not err in refusing to allow allocution before the jury or to allow the defense to argue last. *Id.* (8) The trial court did not err in refusing to quash the jury panel because State law permits exemptions from jury service for elderly or economically disadvantaged persons. *Trice v. State,* 1993 OK CR 19, ¶ 7, 853 P.2d 203, 208, *cert. denied,* 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993). (9) The trial court did not err in refusing a wholesale exclusion of victim impact testimony. *Harris,* 2004 OK CR 1, ¶ 58, 84 P.3d at 752. (10) The trial court did not err in refusing to empanel a separate jury for the punishment phase of trial. *Harris id.* at ¶ 52, 84 P.3d at 751. (11) A defense motion attacking the constitutionality of the jury qualification process in capital cases was properly denied. *Boltz v. State,* 1991 OK CR 1, ¶ 17, 806 P.2d 1117, 1122–23, *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). (12) The trial court properly refused to define "reasonable doubt" for the jury. *Harris,* 2004 OK CR 1, ¶ 51, 84 P.3d at 750–51. (13) A defense motion to strike unadjudicated offenses was properly rejected. *Darks v. State,* 1998 OK CR 15, ¶ 41, 954 P.2d 152, 164.

lant's prior convictions. We found this to be the product of a reasonable strategic decision in our discussion of Proposition 1. Finally, Appellant claims counsel should not have opened the door in the punishment stage to evidence that Appellant robbed a paperboy at knifepoint when he was a juvenile, by calling Appellant's grandmother as a mitigation witness. We addressed this issue in our discussion of prosecutor misconduct, *see* Proposition 16(B), and found neither deficient performance nor unfair prejudice.

¶ 114 Next, Appellant claims trial counsel was ineffective for failing to use available evidence to challenge the admission of luminol tests, blood-swipe analysis, and Appellant's suicide attempt. Pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S. Ch. 18, App. (2003), Appellant timely filed a motion to supplement the appeal record with additional material relating to these issues and requesting an evidentiary hearing. When a defen-

dant alleges, on appeal, that trial counsel was ineffective for not using available evidence, or for not adequately investigating certain evidence which could have been used at trial, our Rules require that he raise the issue in his brief, and in addition, "submit an application for an evidentiary hearing, together with affidavits setting out those items alleged to constitute ineffective assistance of trial counsel." Rule 3.11(B)(3)(b). Appellant must do more than present additional information that could have been used by trial counsel. *See Mayes*, 1994 OK CR 44, ¶ 113, 887 P.2d at 1314. Because we recognize a strong presumption as to the competency of trial counsel, *see Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, "the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i). Appellant has not met that burden here.[14] We cannot conclude that the

---

14. With respect to the luminol and blood-swipe evidence, Appellant seeks only to supplement the record with an article on general considerations in preservation of blood from a crime scene. The defense ably cross-examined the State's forensic experts on these subjects at trial, and also presented expert testimony of its own to refute some of the State's experts' techniques and opinions. Appellant does not present any affidavits or other information suggesting that his own experts were unqualified to testify, that counsel neglected to explore areas of their expertise that would have completely discredited the State's experts, or that such would have affected the outcome of the case.

With respect to evidence of Appellant's suicide attempt, the application contains literature about the effects of various anti-depressant drugs, as well as evidence of Appellant's medical and psychological records. Appellate counsel has provided an affidavit stating that the records were obtained from trial defense counsel's files. Although Appellant provides no information as to whether trial counsel considered using this information, the record shows trial counsel was aware of the following: (1) that according to records obtained from Appellant's employer, he had been prescribed Paxil, an anti-depressant, "sometime in November" of 1994; (2) that Appellant had allegedly not been receiving this medication while in jail after his arrest; and (3) that there was some question in the medical literature as to whether abrupt withdrawal from Paxil can have serious side-effects, including the precipitation of suicidal thoughts. What the record does not show, and what Appellant fails to

demonstrate with his supplementary materials, is (1) any evidence that he was, *in fact*, taking Paxil at any time during the approximately one week of November 1994 before he was arrested; (2) any evidence that taking Paxil for such a short period of time has any effect on suicidal ideation; or (3) any evidence that taking Paxil for even a very short period of time can induce suicidal ideation a month after the medication is ceased. These are important facts that we cannot simply presume.

The medical records Appellant includes in his supplementary materials show Appellant was examined for depression in February 1996; that he has a history of seizures; that in March 1982, he made a suicidal gesture with prescription drugs after an argument with his mother; and that in November 1982, he made a similar gesture "and tried to outrun a police officer" after having problems at the alternative school he had been attending. Appellant has not demonstrated, by clear and convincing evidence, that trial counsel was ineffective for not presenting this information in connection with Appellant's December 1994 suicide attempt. First, the brief self-referral psychological evaluation from February 1996, *over a year after Appellant was jailed and charged in this case*, is of little value. The fact that other traumatic events in Appellant's remote past might have prompted him to make suicidal gestures does not establish that Appellant is constantly suicidal, easily rendered suicidal, or otherwise mentally ill. Appellant does not raise insanity, diminished capacity, incompetence to stand trial, or mental retardation as issues in this appeal. As for his history of seizures, Appellant

supplemental materials *per se* amount to "clear and convincing evidence" that trial counsel was constitutionally deficient, sufficient to warrant an evidentiary hearing. *See Matthews v. State*, 2002 OK CR 16, ¶ 33, 45 P.3d 907, 919, *cert. denied*, 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002). Therefore, Appellant's motion to supplement the record and his request for an evidentiary hearing are **DENIED.**

## I. CUMULATIVE ERROR AND MANDATORY SENTENCE REVIEW

¶ 115 In Proposition 17, Appellant essentially challenges the appropriateness of the death sentence under the factors we are statutorily required to consider. *See* 22 O.S. 2001, § 701.13(C). In Proposition 20, he asks this Court to consider the cumulative effect of any and all trial errors on his conviction or sentence. We consider these related issues together.

¶ 116 This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *See e.g. Ashinsky v. State*, 1989 OK CR 59, ¶ 31, 780 P.2d 201, 209. When there have been prejudicial irregularities during the course of a trial, reversal is warranted only if the cumulative effect of all the errors denied Appellant a fair trial. *Bechtel v. State*, 1987 OK CR 126, ¶ 12, 738 P.2d 559, 561. Although we have rejected most of Appellant's claims of error outright, a few subjects deserve special mention. We have already found, in our discussion of Proposition 7, that certain bad-acts evidence was improperly admitted, not only as hearsay, but as irrelevant to the issues in the case. However, a substantial amount of evidence adversely bearing on Appellant's character, and his credibility as a witness, was properly admitted for various reasons discussed in Propositions 1, 7, and 8. In our discussion of Propositions 1 and 16,

we found certain conduct of the prosecutors to be less than exemplary at times, but we did not find that conduct to have prejudiced Appellant's substantial rights. In other words, while certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial or a reliable sentencing proceeding. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

¶ 117 Pursuant to 21 O.S.2001, § 701.13(C), we are also required to review Appellant's death sentence to determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's findings on aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. As to the latter, the jury found the existence of two aggravating circumstances: (1) that Appellant had previously been convicted of a felony involving the use or threat of violence to the person, and (2) that Appellant knowingly created a great risk of death to more than one person. In our discussion of Proposition 14, we noted that each was amply supported by evidence. The jury rejected two other aggravating circumstances alleged by the State.

¶ 118 As to whether the sentences imposed were the product of passion, prejudice, or any other arbitrary factor, we find no evidence to this effect. We addressed the victim impact evidence in detail in our discussion of Proposition 13, and found no material improprieties there. Appellant presented several witnesses in mitigation. Besides testimony that society could be adequately protected if Appellant were committed to prison, the defense presented testimony from several members of Appellant's family, attesting to favorable aspects of his character and expressing a desire that his life be spared. The conduct of the prosecutor in the punishment phase was not improper.

---

fails to demonstrate how this evidence would bear on the suicide attempt in any way. Appellant himself told the jury about his history of depression, and gave an innocent explanation for his December 1994 attempt; his protestations of innocence were recorded in the letter he wrote to his wife, which was admitted into evidence. Whatever the impetus for Appellant's post-of-

fense suicide attempt, the more probative fact from the State's point of view was the manner in which he attempted it. Finally, the records Appellant proffers include numerous references to Appellant's history of adolescent drug use and general antisocial and aggressive behavior—a line of inquiry that trial counsel might reasonably have chosen to avoid.

¶ 119 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find that the sentence of death was not the product of passion, prejudice, or any other arbitrary factor. Finding no error warranting reversal or modification, the Judgments and Sentences are **AFFIRMED.**

## DECISION

¶ 120 The Judgment and Sentence of the district court is **AFFIRMED.**

LILE, V.P.J., WINCHESTER, J., and STRUBHAR, J.: concur.

LUMPKIN, J.: specially concurs.

LUMPKIN, Judge, specially concurring.

¶ 1 I agree that Appellant's convictions and sentences should be affirmed. I write separately to address Propositions 9, 13 and 21.

¶ 2 In reviewing the sufficiency of the evidence to support the convictions in Proposition 9, we should apply the standard of review set forth in *Easlick v. State,* 2004 OK CR 21, 90 P.3d 556, 559 (adopting a unified standard of review for direct and circumstantial evidence). However, whether we apply *Easlick* or the reasonable hypothesis standard of *Smith v. State,* 1985 OK CR 15, ¶ 7, 695 P.2d at 1362, the evidence is sufficient to support the guilty verdicts.

¶ 3 In Proposition 13, admission of Donna Sanford's victim impact testimony was a violation of 22 O.S.2001, § 984.1(A). *See Lott v. State,* 2004 OK CR 27, ¶ 109, 98 P.3d 318. However, I agree that its improper admission did not improperly influence the outcome of the trial.

¶ 4 Finally, in Proposition 21, Appellant sets forth a litany of issues, which he concedes this Court has previously rejected. While Appellant provides citations to case law where we have previously ruled on the issues, he provides no argument as to the relevancy of the issues to his case. Appellant merely requests that we reconsider our previous decisions. As Appellant has failed to offer any argument in support of his request for reconsideration as required by Rule 3.5C, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001), I find the issues waived for appellate review. *See also Walton v. State,* 1987 OK CR 227, 744 P.2d 977, 979 (the failure to explain how a shortcoming at trial is error waives consideration of the proposition on appeal).